# EXHIBIT 1

(Expert Report of Marie Kerr)

October 4, 2018

Jeff Crocket. Esq.
COFFEY | BURLINGTON
2601 South Bayshore Drive, Penthouse
Miami, Florida 33133

Re: Expert Report
Peter E. Shapiro, P.A. v. Wells Fargo Bank, N.A., Case No. 0:18-CV-60250-UU

Dear Mr. Crocket:

Below is my report regarding my findings and anticipated testimony in the matter of Peter E. Shapiro, P.A. v. Wells Fargo Bank, N.A., Case No. 0:18-CV-60250-UU that I prepared at your request.

## I. ASSIGNMENT

You asked me to prepare a report explaining the facts in the case of Peter E. Shapiro, P.A. v. Wells Fargo Bank (the Bank) from my point of view as a banking and technology expert in the field of financial crime. In particular, I was asked to look at the transactional details of the fraud—which started with phishing—that resulted in a large-dollar amount wire transfer being hijacked from the plaintiff and deposited into the wrong account, a newly-opened checking account at Wells Fargo. The Wells Fargo account, opened for $40 by a Nigerian national who had lived in his apartment for less than one month, was used to funnel fraudulently obtained wired funds into accounts in Nigeria. None of the money was recovered, although Wells Fargo ultimately closed the account after it discovered the stream of suspicious transactions.

Because it was clear that the fraud started with the wire transfer from Citibank to Wells Fargo, I focused my attention on the details of that wire and how Wells Fargo did or did not use commercially reasonable procedures in verifying and authenticating the identity of the beneficiary name as well as account number during the execution of the single wire for $504,000. And although the case included references to subsequent transactions within the account of the fraudster, Chris Achebe, I concluded almost immediately that those transactions were not necessary to understanding the essential issue in this case, namely the failure of Wells Fargo to perform the most rudimentary identity check when processing the stolen wire.

Although I will address in general the policies and procedures of Wells Fargo in this case, a simple, single fact will prove that Wells Fargo was wilfully negligent, and its negligence resulted in a significant loss for Mr. Shapiro.

This report is confined to the defendant Bank's acts and omissions under the circumstances, and I have not been asked to address how the wire instructions were hacked. Wells Fargo calls this type of fraud a Business Email Compromise (BEC).

## II. PROFESSIONAL BACKGROUND AND QUALIFICATIONS

I am the president and founder of the Shamrock Consulting Group, a professional consulting firm in the field of anti-money laundering and financial crime. Shamrock provides consulting services to a range of corporate clients, including large international banks, community banks, and vendors. We assist in implementing and enhancing anti-fraud and anti-money laundering systems; design risk management policies and procedures; and compare available application software solutions.

I received a B.S. in Economics, with a concentration in public policy, from Cornell University and attended the graduate school of management (Kellogg School) at Northwestern University. I have been certified as an anti-money laundering specialist (CAMS), a financial crime specialist (CFCS), and a project management professional (PMP). I have spoken at numerous conferences, written articles and given webinars and have been cited in numerous trade articles. Exhibit A consists of my resume, speaking engagements and press clippings.

Previous to Shamrock Consulting, I was co-founder of Shamrock Systems Corporation, established to market my invention, Claim*Track*, an application system for handling debit card (and other electronic transfers, like ACH) customer claims. Claim*Track* ensured Regulation E compliance and was a case management system with deep auditing functionality to protect against internal and external fraud. With my partner we grew the company to over 100 customers worldwide. We sold the company in 1997. Prior to Shamrock Systems I was a Vice President of Electronic Banking at Riggs Bank in Washington, DC for almost 10 years. At Riggs I was responsible for acquiring software, managing projects and project managers, and ultimately, running the back office for debit card processes, including settlements to multiple payments networks, e.g., Cirrus. In the course of my years at Riggs I regularly researched, evaluated and implemented commercial off-the-shelf (COTS) applications. These included card management, card authorization, payment systems switching and settlement, and total deposits (e.g., Hogan).

I also worked for three years at Unisys, where I worked with mini-computers specializing in front-end data acquisition and validation, financial balancing and file transfers while supporting over a dozen customers from all industries, as well as three years with Prudential and another insurance company, performing process design and training, and implementing a general ledger system. This experience showed me the importance of controls: financial, process, and IT/software access.

Over the course of my career, I have developed substantial experience:

1. Building and implementing back-office and risk management processes
2. Building, implementing and supporting application software
3. Interpreting legislation to implement compliant processes and systems

4. Using application software as a business tool for solving problems
5. Understanding and explaining how software works to non-technical people
6. Analyzing and interpreting data

My most recent cases are *Voodoo.com, Inc. v. The Great American Photo Contest, LLC*, Case No.: 8:17-CV-00949-SDM –AEP, 2018; *Gambrell v. Hartley*, Case No.: 06-C-14-067765, 2015; and *Patricia M. Keppler v. RBS Citizens*, Civil Action No.: 1:12-CV-10768-MLW, 2013. I was deposed in the *Keppler v. RBS Citizens* case; the others settled after my preliminary reports.

I have been paid $300 per hour for this phase of the case; for deposition and trial, my hourly rate is $400.

## III. METHODOLOGY

A document review formed the basis for most of my conclusions. I reviewed the documents using my understanding of how payment systems work as well as Bank Secrecy Act/Anti-Money Laundering (BSA/AML) mandates, and am expressing my opinions through the lens of over 45 years of experience. Through my long career I am also familiar with "Best Practices" that banks should use when dealing with fraud, and I will occasionally cite these as well as actual rules.

The primary documents I reviewed are:

- Complaint
- Chris Achebe account statement
- The detailed "wirecopy" that lists all the actions taken on the wire as it passed through Wells Fargo's Money Transfer System (MTS)
- Deposition of James Ansbro, Wells Fargo V. P. and wire transfer operations manager
- Wells Fargo policies and Procedures, specifically "Operations Wire Transfer Services, Wire Exceptions dated September, 2017.
- The documentation from Wells Fargo's case management system suggesting that a Suspicious Activity Report (SAR) had been filed against Chris Achebe

## IV. CASE BACKGROUND

In preparing this report, I assume that the following facts are true:

1. A wire for $504,000 was initiated by the defendant, Peter Shapiro Esq., as a payment to James Messenger, Esq. (a trustee of Ressselas Trust) to pay off a mortgage loan. The wire request was entered into Citibank's online wires initiation screen. Although Mr. Shapiro correctly filled out the name, bank (M&T), and account number of his beneficiary, James Messenger, somehow the transaction was hijacked and rerouted to Mr. Achebe's account at Wells Fargo. This is the only transaction at issue in this case, and I am not commenting on the method used to hack the wire.

2. When Mr. Messenger alerted Mr. Shapiro that he had not received the funds, Mr. Shapiro contacted Wells and discovered that the funds had gone instead to Mr. Achebe. Wells Fargo accepted no liability for the fraud.
3. Mr. Achebe had opened a checking account with an initial deposit of $40 on November 10, 2017. His Consumer Account Application, Wells Fargo Shapiro p. 465, indicates that he had lived in his current address for less than one month and that he was a citizen of Nigeria.
4. By the time of his first checking account statement, dated December 11, 2017, Mr. Achebe had engaged in a barrage (36) of transactions which included:
    - 4 large incoming wire transfers totalling $647,000, and one large "edeposit" for $33,000. These would be considered high-risk per BSA/AML mandates.
    - Outgoing wires, approximately 60% of incoming funds, also had high-risk elements (e.g., to Nigeria).
    - Other transactions were large cash withdrawals, ATM withdrawals, and purchases that totalled $162,000.
5. Wire transfer fees assessed against Achebe's account totalled $271.
6. Wells Fargo, by inference, filed a Suspicious Activity Report (SAR) on Mr. Achebe based on, by inference, the obvious and numerous red flags per BSA/AML mandates. I presume their transaction monitoring system picked up on the red flags and produced numerous Alerts (transactions that require research in deciding whether to file a SAR).
7. Wells Fargo closed Achebe's account on January 2, 2018. The statement reads "Loss Prevention Closing Entry." Note that in the inferred SAR filing, Wells states that, "No actual loss was incurred by WF."
8. For all wire transfers, FedWire rules require the Beneficiary name and address. In the wire at issue, the $504,000 was not deposited to the Beneficiary, James Messenger, but rather to the credit party. The Credit Party field is a derived field, populated via the hacking of the wire instructions, and the name was that of the fraudster, Mr. Achebe. Mr. Achebe's account number at the Bank was inserted into the Beneficiary Account Number field, rather than Mr. Messenger's.

Although the (rounded) totals for the transactions not covered by this case are moot in the final analysis, they provide a wide-lens view of what happened. Mr. Achebe was clearly a fraudster. The Bank's response to his bad behavior is, I believe, telling. Although Wells responded "appropriately" per BSA/AML mandates when they closed his account and filed a SAR, there is a larger issue here that I will address.

## V. DETAILS of TRANSACTIONS and SYSTEMS with FINDINGS

Among the many pages of documents I reviewed, I almost immediately focused on the details of the $504,000 hijacked wire. Pages 508 through 512 are a detailed printout of how the Wells Fargo MTS system handled the wire. It includes data elements that are analyzed by MTS and it shows what I consider to be the most telling fact: "**Possible name mismatch in CDT Party**," on page 510. This message has only one possible meaning, with two possible explanations.

**The Wire**

Two key pieces of information are found. On page 508, while the Beneficiary is James H Messenger, the Credit Party is Chris Achebe with his account number at Wells Fargo. Note that in the original wire instructions, only the Beneficiary is listed, and it is James Messenger. The key fields in a wire are the Originator and the Beneficiary.

```
CDT *D/000007414400445          ADV:LTR
CREDIT VAL: 17/11/21 CTYP
AMT:504,611.13 CUR:USD
GL RECON: 808808
CHRIS ACHEBE
7421 BURNET RD # 132
AUSTIN                  TX 78757-2244
BNF:/7414400445                  CHG:B BK?N
JAMES H MESSENGER
440 S WARREN ST
SUITE 703
SYRACUSE NY 13202
ORIG TO BNF INFO:
TEL 3154713030
PETER E. SHAPIRO, P.A. ATTORN
EY TRUST
```

On page 510 the Message History Sequence shows the detailed, time-stamped actions the MTS system took while processing the wire. Note the *SYS_MEMO which says, "Possible mismatch in CDT party.

```
    MESSAGE HISTORY SEQUENCE
-----------------------------------
121 is the owning bank. Priority:
        REF_INDEX          REF #: 171121162559  21-NOV-2017 15:00:20.06
        FEDMQIN1           SEQ #: 18722 21-NOV-2017 15:00:20.07 Info: FNPN.TODI
.121000248.A1||||20171121
        FEDIN1             SEQ #: 18719 21-NOV-2017 15:00:20.07
        FLASHRCV           ABA: 021000089  FED REF: G0173253605601
                           IMAD: 1121B1Q8021C03011911211600FT03
        FEDINQ        DEQ
        FEDIN_LOG          AMT: 504611.13    TIME: 21-NOV-2017 15:00:34.24
        ABA_INDEX          KEY: 021000089
        *SYS_MEMO          BBK removed and CDT replaced by BNP in PD routine.
        *SYS_MEMO          *AUTOTRIEVE VLD call:
        *SYS_MEMO          *AUTOTRIEVE, Before-->121|D|7414400445
        *SYS_MEMO          *AUTOTRIEVE, After--->    |D|000007414400445
        *SYS_MEMO          *AUTOTRIEVE VLD V name & address - CDT Acct. D
/000007414400445
        *SYS_MEMO          JD 0068431 N 808808 07921
00000
        *SYS_MEMO          Possible name mismatch in CDT party
        *SYS_MEMO          *CVD:7 DVD:6 PSD:3 SSD:--- DBD:1 CBD:1
```

This shows that the MTS system has identified the fact that the name in the Credit Party field does not match the Beneficiary name. They should be the same.

When I saw the mismatch memo, I expected that some type of manual intervention would have been required. However, there was no routing to the Repair department, and there was no action taken by Wells Fargo.

**The Policy**

In reviewing the Bank's *Wire Exceptions* manual, I found it telling (and confounding) that there was no section for how to handle a wire where the Credit Party does not match the Beneficiary. However, in an acknowledgment of the fact that the Credit Party *should* match the Beneficiary, on p. 552, in the first paragraph, it says, "The beneficiary is also identified as the credit (CDT)

party in the Wire Transfer System format." On that same page there is a note that would seem to have been ignored in this case:

**Important: If an operator reviews the transaction, the bank is responsible for ensuring that the beneficiary name and account number agree.**

Mr. Achebe's account number, inserted via the hack, did not match the Beneficiary (Mr. Messenger) name. What's fascinating here is that however "important" it might be (and prominently stated in the Policy manual) to verify that the beneficiary name and account number agree, this mismatched wire never got to a manual review, so this policy didn't apply.

*That's because it is Wells Fargo's policy is to ignore the mismatch*. The MTS system has been instructed to ignore any mismatch findings, so the transaction at issue was never routed to a person in the Repair section to make such a review.

**The MTS System**

The Money Transfer System (MTS) is the software application that Wells Fargo uses to process wires. In the wire at issue, the MTS discovered the fact that the account number to be credited (Mr. Achebe's) did not match the name of the Beneficiary (Mr. Messenger). Why did the system include the logic to compare those two fields and not do anything when a mismatch was discovered? I can think of only two reasons:

- Like all COTS products, MTS was designed to make wire processing easy for its clients (banks). To ease extra work, the software vendor includes as many features as possible so that the IT staff of the Bank doesn't have to do a lot of "tweaking" to the code. Given how important it is to validate an entity for credit, I believe the MTS as written by the vendor had the matching routine in its code.
- Or, because Mr. Ansbro suggested that Wells Fargo at one time did verify account number and beneficiary name, IT staff at the Bank added the verifying (matching) code. Presumably, at that time the mismatch wire was either sent back to the originating bank or to Repair.

In either case, no one would put a verify routine in a system and not use it. That means that at some point Wells Fargo had the second half of the verify routine removed. For example, the code might read: Compare account number and beneficiary name to the Hogan system, and if one of the fields doesn't match DO SOMETHING. In this case, the DO SOMETHING instructions were deleted, and Mr. Shapiro lost $504,000.

In any case, Wells Fargo knew! And more importantly, they have a duty to act, at a minimum, by sending the wire back to Citibank. Sending the wire back to the originating bank would not affect its 95% straight-through rate. As a former programmer, I can assure you that it would be extremely easy to put back the DO SOMETHING code.

Another relevant point to me is that in the American banking system, there are very few COTS products for processing wires. Most banks use the same software. The software is

tweaked/configured for each bank, but the main logic is the same. What this means is that it is entirely possible for fraudsters to have a deep understanding of such systems and how to use them for their benefit. This puts a burden of care on the banks to make their systems bullet proof against hackers.

**The OFAC Screening**

The Office of Financial Assets Control (OFAC) requires banks to scan the names of banks, countries and entities (businesses and people) to determine if they match a name on the OFAC list (the "bad guys" list). These entities have been identified as terrorists, fraudsters, human traffickers, etc., by the federal government, and our country has placed sanctions on them. OFAC screening is conducted at account opening and on most transactions and is done via the Bank's Global Sanctions Monitoring Operations System (GSMOS).

In this situation, OFAC screening was conducted on the wire in question, and an "alert" was produced. An alert is a warning that a possible OFAC hit was discovered, and per bank policy, such transactions must be reviewed to see if the match was legitimate or a false positive. This alert proved to be a false positive.

Ironically, however, Wells Fargo screened against multiple fields in the wire *except* for the Credit Party (Mr. Achebe). According to the testimony of James Ansbro, "… the name Chris Achebe would not have been part of the sanction screening process because it was not provided by the sending bank." So, Wells Fargo not only gave Mr. Achebe the $504,000 owed to the actual Beneficiary by ignoring the mismatch, it also ensured that the Credit Party was not screened at all.

Wells Fargo willingly conducted its OFAC review turning a blind eye to whom the money was actually, fraudulently paid. This procedure turns the entire purpose of the OFAC review on its head. Wells Fargo's intentional blindness to the evidence of the mismatch permitted funds to be distributed to an unintended party (Achebe), and OFAC screening did not even look at his name. It's entirely possible that Achebe's name was on the OFAC list but Wells Fargo did not even look at it. The Bank failed the due diligence test on two levels.

**The Testimony**

In the testimony of James Ansbro, Wells Fargo V. P. and wire transfer operations manager, on September 9, 2018, Mr. Ansbro clearly states this. When asked by Mr. Crockett why the wire in this case was not sent for repair, despite the mismatch, Mr. Ansbro responded that the MTS system did find the discrepancy between the Credit Party and the Beneficiary (as noted above), and further stated that although this discrepancy was noted in the Message History, the Bank does not do anything about it. They don't send it back to the Originating Bank, and there is no research. The system, instead, calls out to the Hogan deposit system to see if the account number in the wire has a match in their system, and if it does, it figures it's an OK transaction.

**Authentication Standards**

This policy is alarming and shocking on many levels. No other payment processing system that I know uses just one piece of data to determine an entity's identity. For example, the IRS uses Name Control, which uses 4 digits of an entity's last name with the tax identification number before it will post anything. For Visa and Master Card transactions, the name, zip code, card number and security code (4 pieces of data) must match in their system before a payment is processed. Automated Clearing House (ACH) transactions must match name and account number. In other words, payments are only considered valid if at least two pieces of data belong to the same entity.

In this case, despite being aware of the mismatch, and having only one data element that matches something in their system, Wells Fargo has decided to credit their customer even though he wasn't the Beneficiary. A bank as sophisticated as Wells Fargo should have stronger authentication processes for the transferring of money.

Had the wire been sent to Repair, an operator would have seen multiple red flags, which in addition to the mismatch, would have required the wire to be returned to Citibank:

1. A Nigerian national would have to have been risk-rated as High Risk according to BSA/AML best practices. Nigeria is the source of numerous known financial scams.
2. Having lived in his apartment for less than one month is a red flag.
3. Having opened his account with $40 and receiving such a large wire is a red flag.

## VI. CONCLUSIONS

Wells Fargo has made a policy decision to ignore obvious signs of a problem—Beneficiary and Credit Party don't match—and process the wire if there is a matching account number in their bank. In this case, a fraudster's account was credited and Mr. Messenger and Mr. Shapiro are, according to the bank, collateral damage.

The lack of due diligence on the part of Wells Fargo is astounding. They have incorporated lax controls into their systems, policies and procedures that enable the type of fraud evidenced in this case. No other banking payment system credits customer accounts using only one data element; at least two and sometimes more fields are required to ensure an entity match. Their egregious disregard for the best practices used by all other payment systems is a form of malpractice. And in my experience, the fraudsters (especially those in Nigeria who have a long history of using the banking system for fraud) who abuse our payment systems have a sophisticated knowledge of how our systems work. The fact that the Achebe checking account was opened for a small amount and within a month a barrage of suspicious transactions—including multiple funds sent to Nigeria, tells me that they understand the limits of American transaction monitoring systems. (I have seen this in other cases, too). Transaction monitoring systems are typically designed to find patterns of fraud after the fact (typically a month later). Within the first month an account is open, there is always the possibility of fraudulent behavior, because the bank has yet to gather Know Your Customer transaction norms.

The only way to find a fraudulent wire as in this case would be for the Bank to exercise appropriate controls in real time—while the wire is executing. And Wells Fargo failed to do this.

Wells Fargo, in this case and no doubt in many others, has put a Welcome sign out to all who know how to divert and manipulate wires. That they do so with apparent impunity and openly (see Mr. Ansbro's testimony) is appalling. The easiest solution going forward, to prevent a repeat of this stealth, is for Wells Fargo to return wires with this mismatch to the sending financial institution. This would let them maintain their 95% "straight through" rate and would ensure that fraudsters who bank with them will not be credited with someone else's money.

Marie Kerr

Marie Kerr
Expert Witness

# MARIE G. KERR

*(410) 353-4414*

*mkerr.shamrock@comcast.net*


## EXECUTIVE SUMMARY

Financial industry veteran with a deep understanding of how financial institutions work, specializing in financial crime/fraud detection; anti-money laundering (AML); regulatory issues, including Bank Secrecy Act (BSA); compliance solutions; data analytics; software development and implementation; and payment systems. Practice includes both high-level advisory and hands-on work in the public and private sectors including:

- Payment systems analysis
- Fraud risk analysis and mitigation
- Software acquisition/vendor management
- AML data and software validation
- Expert witness reports/testimony
- Fraud detection scenario development
- Gap and data analysis

## PROFESSIONAL EXPERIENCE

**Founder** — **Shamrock Consulting Group**

**2001 – present** — **Washington, DC metro area**

Created consultancy offering unique competencies in technology, back/middle office, financial crime/fraud/AML detection and mitigation. Recent engagements include:

- *Litigation Support*—developed strategy and interrogatories for financial crime (fraud) case involving large international banks;
- *Homeland Security Program Advisor and Fraud Detection SME*—stood up a Know Your Customer (KYC)/Compliance/fraud detection program for a DHS program;
- *Bank Merger + Acquisition: IT and AML Advisor*—developed IT and AML integration and validation plans for a three-bank merger;
- *Forensic AML "Look-back"*—member of a forensic AML investigation with a concentration on due diligence of parties and counterparties in wire transfer transactions;
- *AML Program Assessment and Development—International Gaming Company*—advised Mexico-based gaming company on their money laundering risks and mitigation strategies;
- *AML Product Assessment for Large Vendor*—created product strategy and competitive assessment for a major transaction monitoring vendor experiencing slowing sales;
- *AML Program and Risk Assessment*—assessed Bank Secrecy Act/AML compliance for a large mortgage financing company;
- *Project Manager for AML Transaction Monitoring systems*—implemented several commercial off-the-shelf (COTS) AML transaction monitoring/ case management systems.

**Program Manager** — **ACI Worldwide**

**1997 – 2000** — **Omaha, NE**

Project expert and champion for my Regulation E intellectual property, Claim*Track*, after the product was purchased by ACI. As Program Manager, exhibited product; created sales and marketing collateral; trained staff; and worked with other vendors to create new software solutions using Claim*Track* as the base technology. Claim*Track* is still being sold by ACI under the name ACI Claims Manager.

**Co-Founder and COO** **Shamrock Systems Corporation**
**1988 – 1997** **Crofton, MD and Alexandria, VA**
Designed, developed, marketed and supported Claim*Track*, the first COTS product for debit card claims, adjustments, chargebacks and Regulation E compliance. The software included case management, fraud detection and compliance functionality, and realigned back office functions. It was used by over 100 financial institutions worldwide, including Bank of America, Washington Mutual and Citibank. We sold the company and product to ACI Worldwide in 1997.

**Vice President and Manager, Electronic Banking** **Riggs Bank**
**1979 – 1988** **Washington, DC**
Implemented technical infrastructure and processes for Riggs' entrance into regional and international debit card networks; member of networks' operating committees; member of American Bankers Association (ABA) conference development committees.

**Assistant Vice President, Business Systems Analysis**
Managed staff of internal consultants and Project Managers during period of rapid growth, organizational change and new technologies.

## EDUCATION

Cornell University, BS, Economics
Kellogg School of Management, Northwestern University, 1 year of MBA coursework

## CERTIFICATIONS/MEMBERSHIPS/VOLUNTEER

Certified Financial Crime Specialist (CFCS)
Certified Anti-Money Laundering Specialist (CAMS)
Certified Project Management Professional (PMP)
Cornell Alumni Admissions Ambassador Network (CAAAN)
Maryland Department of Aging—Certified Volunteer Ombudsman

## PUBLICATIONS (Partial List)

- *How Back Office Processes can sabotage even the best Transaction Monitoring Systems*, Money Laundering Alert, June, 2007
- *The Infrastructure of Compliance—Building a Bridge to Vendor BSA/AML Solutions*, Money Laundering Alert conference paper, 2005
- *It's all about the Data*, ACAMS Anti-Money Laundering Technology Resource Directory, 2003-2004

## SPEAKING ENGAGEMENTS (Partial List)

- ACFCS International Financial Crime Conference, 2012: *The Feedback Loop—Analyze your Analytics* and *Employee Due Diligence—Process Controls to the Rescue*
- ACFCS webinar, 2012: *The Anatomy of Financial Crime Through the Lens of IT Systems* (How seemingly small decisions/changes may signal fraud)
- 10th and 12th Annual International Money Laundering Conference & Exhibition, 2005 and 2007; Featured Speaker in 2007
- Financial Markets World**:** *AML in the Securities and Investments Industries*, 2005

**MARIE G. KERR**
**SPEAKING ENGAGEMENTS, 2005 – PRESENT**

**September, 2102** — **International Financial Crime Conference & Exhibition, Association of Certified Financial Crime Specialists (ACFCS)**
Featured speaker on four-person panel "Guarding against the "Enemy Within"—Best Practices in Employee Due Diligence at Onboarding and After You Give Them the Keys"

Speaker on four-person panel "How Knowledge Engines, Investigative Systems and Transaction Monitoring Tools Can Beat Financial Crime—Technology to the Rescue"

**August, 2012** — **ACFCS Webinar "The Anatomy of Financial Crime through the Lens of IT Systems,"** sole presenter

**September, 2007** — **Money Laundering Alert Webinar "*Improving Transaction Monitoring by capturing the right information*"**
Member of two-person panel

**March, 2007** — **Money Laundering Alert's 12th Annual International Money Laundering Conference & Exhibition**
Featured speaker on four-person panel "Look-Backs" – the Regulatory Rage that is Making Financial Institutions Crazy"

Speaker on four-person panel "Improving Transaction Monitoring – and the Chance to Detect Money Laundering – by Capturing the Right Information"

**May, 2006** — **Money Laundering Alert Webinar "*Technology: AML Program's Ally for SAR Reporting"***
Member of two-person panel

**October, 2005** — **Financial Markets World, "*Anti-Money Laundering in the Securities and Investment Industries"***
Moderated and spoke on four-person panel

**March, 2005** — **10th Annual Money Laundering Alert's International Money Laundering Conference & Exhibition**
Speaker on four-person panel: "Compliance vs. Privacy"

Speaker on four-person panel: "Using AML Technology to the Fullest"

**MARIE G. KERR**
**RECENT PUBLICATIONS & PRESS CLIPPINGS**

**PUBLICATIONS:**

"Why Financial Crime Detection and Prevention Matters: The case of the silver fox who the golden retirement egg and how banks should bank the lonely" ACFCS News, April 1, 2016

"Criminal Intent: A Consultant's Lament" *Association of Certified Financial Crime Specialists (ACFCS)* conference paper, September, 2012

"In addition to monitoring customers, institutions must watch their IT units where insider financial crime can lurk" *ACFCS,* May 22, 2012

"IT expert guides institutions on financial crime risks in IT departments" *ACFCS,* June 4, 2012

"How back office processes can sabotage even the best monitoring systems" *Money Laundering Alert*, June, 2007, p. 4

"Look-Backs: the Overwrought, the Streamlined and How to Prevent Them" *Money Laundering Alert* conference paper, March 2007

"TECHNOLOGY - Clean examiner audits require careful linkage of compliance data" *Money Laundering Alert,* March 2005, p. 13

"The Infrastructure of Compliance—Building a Bridge to Vendor BSA/AML Solutions" *Money Laundering Alert* conference paper, March 2005

"It's All About the Data" Association of Certified Anti-Money Laundering Specialists (ACAMS) *Anti-Money Laundering Technology Resource Directory, 2003-2004*

"TECHNOLOGY - How one Intranet document can make audits go smoothly" *Money Laundering Alert*, November 2004, p. 13

**PRESS CLIPPINGS:**

July 9, 2015, *ACFCS News*, "OCC Concerned about How Banks Attract, Retain AML Talent, Gauge Crime Risks and Defend against Hackers: Report"

November 29, 2011, *Moneylaundering.com News,* "Many Financial Institutions Unlikely to Meet FinCEN's E-Filing Deadline"

April 21, 2011, *Moneylaundering.com News, "*Distinguishing Hiccups from Systemic Failure Isn't Always Easy, Say Compliance Pros"

February 11, 2011, *Moneylaundering.com News*, "Zions Bank Fined $8 Million for Failing to Report Suspect Casas de Cambio Deposits"

November 18, 2010, *Moneylaundering.com News*, "Acquiring Failed Banks Can Mean Buying Compliance Risks, Say Consultants"

September 17, 2010, *Moneylaundering.com News*, "Examiners Prodding Banks on Client Risk Rankings, Say Compliance Officials"

June 3, 2010, *Moneylaundering.com News*, "FinCEN Issues $1 Million Fine Against Troubled New Jersey Bank Penalized in March"

March 30, 2010, *Moneylaundering.com News*, "As Budgets Have Shrunk, Banks Have Fallen Behind on SARs, Risk Ranking: Regulators"

December 31, 2009, *Moneylaundering.com News*, "Professionals Disagree on When to File SARs on Suspected Evasion of Civil Payments, Tax Liens"

April 15, 2009, *Moneylaundering.com News*, "IRS Seeks Payment Processor Data in Offshore Tax Probe"

February 19, 2009, *Moneylaundering.com News*, "Merged 'Megabanks' Face Compliance Culture Clashes, Training Challenges"

November, 2008, *Money Laundering Alert*, p. 8, "Merging Banks Shouldn't Skimp on AML, Say Consultants"

August 27, 2008, *Moneylaundering.com News*, "Keeping Out Booted Customers Increasingly Important for Banks, Say Compliance Professionals"

August 22, 2008, *Moneylaundering.com News*, "Skimping on AML Training Could Be Costly Compliance Cutback, Say Compliance Professionals"

August, 2008 *Money Laundering Alert*, p. 1, "Online gambling regulations will mean new due diligence for banks, say analysts"

June 9, 2008, *AML Compliance Alert*, p. 1 "Project Management: Don't Fall Victim to Poor Project Planning – 4 Tips Ensure Success"

May 29, 2008, *Moneylaundering.com News*, "Fraudsters turning to payment processors to defraud customers, launder money"

March, 2008, *AML Compliance Alert*, p. 1 "Risk Management: Boost AML Efforts for Prepaid Cards with These Monitoring and Risk FAQs"

March, 2008, *AML Compliance Alert*, p. 1 "Case Management: Prepare to Meet Regulatory Requirements with These 4 Case Management Essentials"

January 14, 2008, *Moneylaundering.com News*, "Nonbank ATMs, deemed low risk for laundering, present compliance challenges"

November, 2007 *Money Laundering Alert*, p. 11 "Get directors to take AML training seriously with tough talk"

October, 2007 *Money Laundering Alert*, p. 4 "Meshing AML systems is critical in mergers and acquisitions"

October 5, 2007 *Fortent Inform*, "Poor Business Classification, Expired Documents often Undermine Customer ID Programs"

August 27, 2007 *Moneylaundering.com News*, "Third-party payment processors key to offshore bank fraud, laundering case"

June, 2007 *Money Laundering Alert*, p. 5 "FDIC orders look-backs in two AML-related enforcement actions"

April 16, 2007, *Securities Technology Monitor* and *Securities Industry News*, "A New Look at AML Look-Backs"

April 4, 2007, *Moneylaundering.com News*, "NCUA orders New Jersey credit union to review customer ID numbers"

February 15, 2007, *Moneylaundering.com News*, "Pennsylvania bank ordered to scrutinize its vendors"

January, 2005 *Money Laundering Alert*, p. 13 "TECHNOLOGY - FDIC guidance holds AML software liable for regulatory compliance"