# Exhibit 4

## Transcript of Deposition of Corporate Representative of Wells Fargo Bank, N.A.'s

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Case No. 0:18-CV-60250-UU

PETER E. SHAPIRO, P.A.,
Plaintiff,
vs.
WELLS FARGO BANK, N.A.,
Defendant.

---

30(B)(6) VIDEO
DEPOSITION OF: JAMES ANSBRO

DATE: September 5, 2018

TIME: 12:14 p.m.

LOCATION: Smith Moore Leatherwood, LLP
101 North Tryon Street
Charlotte, NC

TAKEN BY: Counsel for Plaintiff

REPORTED BY: Sherri L. Puleo, Court Reporter

---

APPEARANCES OF COUNSEL:

ATTORNEYS FOR THE PLAINTIFF
PETER E. SHAPIRO, P.A.:

COFFEY BURLINGTON
BY: JEFFREY B. CROCKETT
2601 S. Bayshore Drive
PH 1
Miami, FL 33133
(305) 858-2900
jcrockett@coffeyburlington.com

ATTORNEYS FOR THE DEFENDANT
WELLS FARGO BANK, N.A.:
FOX ROTHSCHILD, LLP
BY: AMY S. RUBIN
777 South Flagler Drive
Suite 1700 - West Tower
West Palm Beach, FL 33401
(561) 804-4417
arubin@foxrothschild.com

ALSO PRESENT:

JOHN GIRDLER, VIDEO SPECIALIST



INDEX


| | PAGE | LINE |
|---|---|---|
| EXAMINATION BY MR. CROCKETT | 6 | 3 |
| EXAMINATION BY MS. RUBIN | 158 | 19 |
| SIGNATURE OF DEPONENT | 162 | |
| CERTIFICATE OF REPORTER | 164 | |


REQUESTED INFORMATION INDEX

(No Information Requested)

EXHIBITS


| | PAGE | LINE |
|---|---|---|
| PLF. EXH. 1, RE-NOTICE OF DEPOSITION | 13 | 13 |
| PLF. EXH. 2, DOCUMENT BATES STAMPED WELLS FARGO SHAPIRO 500 - 507 | 34 | 25 |
| PLF. EXH. 3, WIRE DETAIL SUMMARY | 38 | 22 |
| PLF. EXH. 4, DOCUMENT BATES STAMPED PS 18 - 19 | 59 | 2 |
| PLF. EXH. 5, CONSUMER ACCOUNT APPLICATION | 63 | 9 |
| PLF. EXH. 6, CONSUMER ACCOUNT AGREEMENT | 64 | 7 |
| PLF. EXH. 7, DOCUMENT BATES STAMPED PS 7, | 65 | 9 |
| PLF. EXH. 8, GSMOS PROCESSING DOCUMENT | 66 | 22 |
| PLF. EXH. 9, DOCUMENT BATES STAMPED WELLS FARGO SHAPIRO 508 - 512 | 82 | 11 |
| PLF. EXH. 10, DOCUMENT BATES STAMPED WELLS FARGO SHAPIRO 513 - 515 | 128 | 15 |
| PLF. EXH. 11, DOCUMENT BATES STAMPED WELLS FARGO SHAPIRO 543 - 659 | 133 | 2 |




EXHIBIT CONTINUED


| | PAGE | LINE |
|---|---|---|
| PLF. EXH. 12, DOCUMENT BATES STAMPED WELLS FARGO SHAPIRO 242 - 250 | 142 | 14 |
| PLF. EXH. 13, DOCUMENT BATES STAMPED WELLS FARGO SHAPIRO 422 - 425 | 144 | 21 |
| PLF. EXH. 14, DOCUMENT BATES STAMPED WELLS FARGO SHAPIRO 379 - 389 | 147 | 6 |
| PLF. EXH. 15, DOCUMENT BATES STAMPED WELLS FARGO SHAPIRO 11 - 13 | 147 | 14 |
| PLF. EXH. 16, DOCUMENT BATES STAMPED WELLS FARGO SHAPIRO 3 - 4 | 148 | 16 |
| PLF. EXH. 17, DOCUMENT BATES STAMPED PS 29 - 32 | 151 | 10 |
| PLF. EXH. 18, WELLS FARGO BANK, N.A.'S NOTICE OF SERVICE OF ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES | 152 | 9 |
| PLF. EXH. 19, WELLS FARGO BANK, N.A.'S RESPONSE TO PLAINTIFF'S SECOND SET OF INTERROGATORIES | 152 | 13 |
| PLF. EXH. 20, DOCUMENT BATES STAMPED PS 27 | 155 | 2 |
| PLF. EXH. 21, DOCUMENT BATES STAMPED WELLS FARGO SHAPIRO 466 - 473 | 155 | 4 |
| PLF. EXH. 22, DOCUMENT BATES STAMPED WELLS FARGO SHAPIRO 474 - 477 | 155 | 7 |
| PLF. EXH. 23, DOCUMENT BATES STAMPED WELLS FARGO SHAPIRO 478 - 481 | 155 | 10 |
| PLF. EXH. 24, DOCUMENT BATES STAMPED WELLS FARGO SHAPIRO 482 - 485 | 155 | 13 |
| PLF. EXH. 25, DOCUMENT BATES STAMPED WELLS FARGO SHAPIRO 486 - 489 | 155 | 16 |
| PLF. EXH. 26, DOCUMENT BATES STAMPED WELLS FARGO SHAPIRO 490 - 493 | 155 | 19 |
| PLF. EXH. 27, DOCUMENT BATES STAMPED WELLS FARGO SHAPIRO 494 - 497 | 155 | 22 |




* * * * * * * * * * * *

VIDEOGRAPHER: We're going on the record. The time on the monitor is 12:14 p.m.

This is the video deposition of James Ansbro as 30(b)(6) witness for Wells Fargo Bank, N.A. taken by the Plaintiff in the matter of Peter E. Shapiro, P.A., Plaintiff, versus Wells Fargo Bank, N.A., Defendant, under the jurisdiction of the United States District Court for the Southern District of Florida, Case Number 0:18-CV-60250-UU.

This deposition is being held at Smith, Moore, Leatherwood. 101 North Tryon Street, Charlotte, North Carolina on Wednesday September 5, 2018.

My name is John Girdler. I'm the Video Specialist. The Court Reporter is Sherri Puleo. We're here in association with First Choice Reporting.

Counsel will now state their appearances for the record, and the Court Reporter will swear in the witness.

MR. CROCKETT: Jeffrey Crockett. Coffey Burlington. Counsel for the Plaintiff.

MS. RUBIN: Amy Rubin. Counsel for Wells Fargo Bank, N.A.

Page 6

JAMES ANSBRO
being first duly sworn, testified as follows:
EXAMINATION
BY MR. CROCKETT:
**Q. Good afternoon, sir.**
A. Good afternoon.
**Q. Please begin by stating your full name.**
A. James Ansbro.
**Q. And what is your position?**
A. I'm a vice president and wire transfer operations manager at Wells Fargo.
**Q. How long have you worked for Wells Fargo?**
A. I've worked for Wells Fargo for the last -- going on 25 years.
**Q. Okay. So you're -- there's another James Ansbro that works for Wachovia, correct?**
A. No. I started -- I started at a bank in New Jersey that through acquisitions, one of which was Wachovia, ended up at -- being part of Wells Fargo --
**Q. Okay --**
A. -- so it's all the same bank. All together adds up 25 years.
**Q. You need to update that Linked- -- that LinkedIn in profile.**

Page 7

A. Yeah. You're right about that. You're right about that.
**Q. Okay. Tell -- tell me about your background in -- in banking. When you first started out in banking.**
A. I -- my first job in banking was over 40 years ago in 1976, with Manufacturers Hanover Trust in -- in New York. That bank eventually merged and was acquired, ended up being part of what's now JPMorgan Chase. And after 17 years there, I took another job at First Fidelity Bank in New Jersey. First Fidelity was acquired by First Union here in Charlotte, First Union acquired Wachovia, Wachovia was acquired by Wells Fargo, and that's where the last 25 years.
So the first 17 years with a bank that's now part of JPMorgan Chase, the last 25 with what's now Wells Fargo.
**Q. How long have you been with Wells Fargo as opposed to Wachovia?**
A. About -- 2008, the -- the acquisition was -- was completed, so the last -- the last ten years, I guess would be --
**Q. Okay.**
A. -- Wells Fargo time.

Page 8

**Q. Have you been the Wells Fargo wire transfer operations manager since 2008?**
A. I've been a wire transfer manager, you know, there are others besides me; but, yes, since 2008, yes.
**Q. Okay. All right. What are your duties as a world -- a wire transfer operations manager?**
A. My staff is responsible for processing incoming and outgoing wire transfers.
**Q. How many -- well, let me ask: Where are you based?**
A. Here in Charlotte.
**Q. How long have you been -- been based in Charlotte?**
A. Since 1996.
**Q. Okay. And how many wire transfer operators report to you?**
A. About 40 report to me directly now.
**Q. Okay. How many are there in -- are they all in Charlotte?**
A. Well, there's -- we have three domestic sites: Charlotte is one of them; also Golden, Colorado; and a third one in Portland, Oregon. And then we have staff in Hong Kong who have a dotted line responsibility to me. They don't report to me

Page 9

directly, they report to their local staff in -- in Hong Kong. But they're accountable to me and they -- they perform their jobs, they accept direction from me.
**Q. Okay. Let me -- let me just get those three locations again.**
A. Sure.
**Q. Okay. One was Oregon; Portland, Oregon?**
A. Portland, Oregon; Golden, Colorado; Charlotte, North Carolina.
**Q. Okay. And are there 40 here in Charlotte?**
A. No, there's three, six -- 10 here -- 10 here in Charlotte, and approximately 12 at the other site -- 12 each at the other site. So I don't know if that math works out, but roundabout.
**Q. And how many in Hong Kong?**
A. Sixteen.
**Q. Okay. What's the difference, if any, between the job duties of the folks at the various four locations that report to you?**
A. The job duties are -- are pretty much the same in the domestic sites; by "domestic" I mean the ones in the U.S.: So Portland, Golden, and Charlotte are all pretty much the same.

Page 10

The -- the staff in Hong Kong, their -- their responsibilities are -- are a little bit more narrowly focused. We don't allow the folks in Hong Kong to perform any functions that involve telephone contact. So their -- their responsibilities is somewhat limited, but they involve the repair of wire transfers. Those are wire transfers that are not processed in a totally automated way.

We call the -- the totally automated transactions straight-through transactions. The non-straight-through transactions we call repair transactions. Those are the ones that my staff works on, and they -- they work to put the transactions into a -- a format that's acceptable to the system. So that's what part of my team does.

The other part of my team does what we call risk processing, which is -- main function there is to make sure that the -- there's -- there's enough money in the customer's account before you -- before you debit it and send the wire out.

**Q. If it's an out-going wire?**

A. If it's an out-going wire, right.

Page 11

And then the other main function of that team is sanction screening, sometimes known as OFAC screening, which is basically making sure that there are no violations of sanction involved in the processing of a transaction.

**Q. Does -- do repair operations and OFAC screening go on at all four of the location that's you mentioned?**

A. No. So that's -- so -- yes, all three of -- of -- of the locations, all three of the domestic locations they do.

I'm sorry, could you repeat the question?

**Q. You've -- you've indicated there were three different functions: Repair, risk processing, and sanction screening.**

A. Right.

**Q. Do all three of those -- are all three of those functions performed at all four of the locations that you mentioned?**

A. No. So two of them -- two of them are, and one of them is not.

In Hong Kong we don't do the risk processing. We do sanction screening, but we don't do that balance monitoring function that I was talking about earlier.

Page 12

**Q. Okay. And repair operations --**

A. Yes, they -- they do that --

**Q. -- are all four --**

COURT REPORTER: I'm sorry. You're talking over each other.

BY MR. CROCKETT:

**Q. Yeah, hold on --**

A. I'm sorry.

**Q. This is -- you have to wait -- I always say wait for the question mark. The Court Reporter will correct us.**

A. Okay.

**Q. Do repair functions of the folks that report to you go on at the Oregon, Colorado, Charlotte, and Hong Kong locations?**

A. Yes.

**Q. Okay. All right. Now, you indicated that there are -- that there's more than one Wells Fargo wire transfer operations manager; did I hear you -- did I hear you right?**

A. Right. So I'm -- I'm part of a management team that we manage the various functions of the -- of the -- of the wire transfer department. The functions I described to you are the ones that I manage.

Page 13

**Q. I see.**

A. There are other parts of the department that are managed by peers of mine.

**Q. Okay. All right. And -- and how many are in others -- how many other people are in the Wells Fargo wire transfer management team?**

A. I have three peers and, you know, we report to senior manager.

**Q. Okay.**

A. And then some of us have managers who report to us, you know, more junior managers. I happen to have two.

(PLF. EXH. 1, RE-NOTICE OF DEPOSITION, was marked for identification.)

**Q. All right. Okay. You -- you are here as a -- the corporate representative of Wells Fargo Bank. I'm going to show you what's been marked as Exhibit 1.**

**Here is a copy for counsel. It's been marked as Plaintiff's Exhibit 1.**

**Do you understand that you're testifying as the corporate representative of Wells Fargo Bank on the subject of this case between Mr. Shapiro as P.A. and Wells Fargo Bank?**

MS. RUBIN: Object to the form.

Page 14

He is here as the corporate rep testifying as to certain topics, not necessarily all of them on this sheet of paper. I think there's two areas that he's not able to testify about.

MR. CROCKETT: Okay. You can just tell me which ones he's not testifying about.

MS. RUBIN: Yeah, so he's -- it is (3)(c) he's not able to testify about; and in so far as (3)(b), I -- Dori has advised she -- he can testify about -- let me just pull the pages out -- he will be testifying about 508 through the last document, which is 515. And then the only other areas I believe there's one inquiry about Number 7, I believe.

BY MR. CROCKETT:

**Q. Okay. So I may ask you those questions, sir, but you can just say you don't know, if you don't --**

A. Okay.

**Q. -- if you don't -- if you don't know.**

**Okay. But you -- you do understand that you have been designated to give testimony by Wells Fargo on subjects --**

A. I do.

Page 15

**Q. -- listed in that -- in that deposition notice, correct?**

A. I do, yes.

**Q. Okay. Did you have any involvement in the facts of this case prior to being designated on behalf of Wells Fargo?**

A. Personal involvement?

**Q. Yes.**

A. Well, Amy and I discussed the -- the -- the -- the transaction.

**Q. Okay. That's fine.**

**How did you learn that you were the -- going to be the designated Wells Fargo for --**

A. I was contacted by our law department, and they were seeking someone who could testify regarding the facts of the way the transaction was processed.

**Q. Okay. Was that your first awareness of the existence of this case?**

A. Yeah.

**Q. Okay. And when was that? I'm just asking for a time.**

A. Few weeks ago.

**Q. Okay.**

A. Less than a month, I think.

Page 16

**Q. Okay. What did you do to prepare to give this testimony on behalf of Wells Fargo?**

A. I reviewed the transaction that was processed and discussed it with Amy.

**Q. Had you -- had you discussed the subjects listed in the depo designation with anyone else other than your attorney?**

A. I discussed it with my manager.

**Q. Okay. Well, tell me about that discussion.**

A. Just reviewed the transaction; made him aware that I was going to be doing this; made sure that he was okay with me representing the bank to -- today.

**Q. What's the name of your manager?**

A. His name is Charles Jones.

**Q. Where is he based?**

A. He's based in Portland, Oregon.

**Q. Okay. And do you directly report to Mr. Jones?**

A. I do.

**Q. Okay. And the other three managers also report to Mr. Jones?**

A. That's correct.

**Q. Okay.**

Page 17

MS. RUBIN: Go ahead and finish, 'cause I know you talked to Riko; I mean, go ahead and finish it.

THE WITNESS: Oh. Yeah, so part of what was being asked here was if Riko Ong who was the -- the sanction screening, the only -- the only manual intervention that was involved in the processing of this transaction was by Riko Ong who is an operator in Hong Kong, doing a sanction screening that we talked about earlier, and I did speak to Riko regarding his recollection or memory of processing the transaction.

BY MR. CROCKETT:

**Q. Okay. So Riko Ong is a -- is a man?**

A. Yes.

**Q. Okay.**

A. That's a good question.

**Q. We -- we couldn't figure it out, the attorneys.**

**Okay, so what -- what did -- what was -- what did Mr. Ong report to you regarding --**

A. That he had no recollection, no memory of processing the transaction.

**Q. And this was not --**

A. Unsurprised.

**Q. -- not unexpected --**
A. Yes.
**Q. -- right, because --**
A. Yeah, he does hundreds of these a day, and --
MS. RUBIN: And there goes Jeff's trip to Hong Kong.
MR. CROCKETT: I've always wanted to go to Hong Kong, Mr. Ansbro, but it will not be on this case.
MS. RUBIN: I was there once and had a kidney stone there, so don't go. I didn't want to go back.
MR. CROCKETT: Could have been worse, it could have been on the flight, Ms. Rubin, and you wouldn't have wanted that.
BY MR. CROCKETT:
**Q. Okay. All right. So other than talking to Mr. Jones and Mr. Ong, did you talk to anyone else regarding the subject of this deposition?**
A. Yeah, some -- some of the folks in our loss management area because we had to collaborate on preparing some of the responses to the interrogatories.
**Q. Okay. I believe you signed both**



**interrogatories --**
A. Yes.
**Q. -- on behalf of -- wait for the question mark.**
**You signed both interrogatories on behalf of Wells Fargo, correct?**
A. Yes.
**Q. Okay. And -- and you -- before you -- you worked with others on reviewing those answers before you signed them?**
A. Yes.
**Q. Okay. And you indicated loss -- loss management, what does -- what does that mean in the Wells Fargo world?**
A. They are a part of the bank that gets involved with cases such as -- such as this one where there's a -- you know, becomes a legal matter.
**Q. Okay. Involved in defending Wells Fargo --**
A. Yes.
**Q. -- in lawsuits. Okay.**
**Are they attorneys?**
A. No.
**Q. Okay.**



A. Not the folks I dealt with.
**Q. All right. Anyone else?**
A. Not that I can think of.
**Q. Okay. All right. Let me -- and this will just -- just save -- save time, I think. Some of the questions I will show you documents, others I can just -- I can just ask you right -- right now.**
**The quest- -- Question 5 on this list, "Wells Fargo's actions and procedures when there's a mismatch between the intended and actual beneficiaries on incoming wire transfer from another bank."**
**What -- what is Wells Fargo's procedure in that situation?**
MS. RUBIN: Object to the form. It's vague and insufficient information.
But go ahead, to the extent you can answer.
THE WITNESS: Well, considering the -- the transaction involved here, there -- there were no actions or procedures because the system processed the transaction in a -- in a -- in an automated way, with the exception of the sanction screening process. Then we -- you know, and I can



talk it about that more specifically.
But other than the sanction screening process, the -- the -- the transaction was processed automatically by our system and without any operator or human intervention.
BY MR. CROCKETT:
**Q. Okay. When you say "the system processed" --**
A. Yeah, the wire transfer system.
**Q. What is -- what are you -- is there a term --**
A. MTS.
**Q. -- that you use?**
A. MTS.
**Q. Okay. Is that the -- the same thing as HOGAN?**
A. No. So MTS stands for Money Transfer System. That's the wire -- that's where the wires are processed. HOGAN is the DDA system where the debits and credits are posted for demand deposit accounts.
**Q. Okay. Are both MTS and HOGAN systems that are internal to Wells Fargo?**
A. Yes.
**Q. Okay. Okay. So -- so -- you know, I**

Page 22

**understand you gave me information about that, and believe me, we'll follow up, we'll see documents on that.**
**But let me ask: When -- when -- when Wells Fargo knows that there's a mismatch between the acted -- actual and intended beneficiaries on incoming wire transfer, what does Wells Fargo do?**
A. We're talking about a hypothetical situation.
**Q. Well, it may be a real situation.**
A. Well, it happens real --
**Q. I'm not saying --**
A. Okay. It's just -- all right. So real quick. So yes, if we have knowledge --
**Q. And again, answer any way you want.**
A. -- if we -- if -- if -- my operators are trained so that if they're repairing a transaction and they recognize that the name of the -- provided by the sending bank and the account number provided by the sending bank refer to two different parties, they're trained to recognize that and return the funds to the sending bank advising them that the name and the number disagree.
**Q. And that --- that happens with fair regularity; does it not?**

Page 23

A. Yes.
**Q. Okay.**
MS. RUBIN: Let me just object to the extent that's somewhat vague and --
COURT REPORTER: I'm sorry. I didn't hear that.
MS. RUBIN: Somewhat vague. Are we talking about --
MR. CROCKETT: Well --
MS. RUBIN: -- it's fairly regular --
MR. CROCKETT: -- let me expand on that.
MS. RUBIN: Yeah. And if you want me to just say: Is it fairly regular between the number coming into the repair department under the system or over the billions of wire transfers we get a day, so?
BY MR. CROCKETT:
**Q. Okay. Well, your -- your -- your counsel is essentially asking: What do you mean -- what is -- how regular is -- is reg- -- is fairly regular?**
MS. RUBIN: So I'm going to just object --
BY MR. CROCKETT:
**Q. How often --**

Page 24

MS. RUBIN: -- to the form.
BY MR. CROCKETT:
**Q. -- how often -- how often does -- does -- does that happen on a daily basis?**
A. Well, I -- I couldn't tell you, off the top of my head --
**Q. Okay.**
A. -- you know, I can take a wild guess, but --
MS. RUBIN: No, don't take a wild guess.
THE WITNESS: -- but that would -- that would be all it would be.
What I would -- what I'd tell you is that we repair a couple of thousand wires every day, and some subset of those would be repairs that result in a recognition that the name and the number don't agree and the transaction gets returned.
BY MR. CROCKETT:
**Q. Okay. And -- and "repair," I believe, was the term you used for when there's a person who -- it's not simply an automated process, when -- when a person looks at a wire transfer?**
A. Right. It's a -- what we call a non-straight-through transaction is a repair. So one that's not processed in a totally automated

Page 25

way.
**Q. Okay. So -- so there's a -- there's a straight -- Wells Fargo defines the word, there's straight-through transactions and repair transactions --**
MS. RUBIN: Object --
BY MR. CROCKETT:
**Q. -- correct? Is that -- am I --**
MS. RUBIN: Object to the form.
BY MR. CROCKETT:
**Q. Am I understanding that correctly?**
THE WITNESS: Am I allowed to answer that?
MS. RUBIN: Yeah. Yeah.
THE WITNESS: Yes, so there's -- there's two types of wire transfers: Ones that are repaired, and ones that are straight through.
BY MR. CROCKETT:
**Q. Okay. And you indicated approximately 2,000 a day are in the repair category, correct?**
A. Yeah -- roughly, yes.
**Q. I understand this is a --**
A. Yeah.
**Q. -- this is an estimate. I'm sure it changes --**

A. Right.
**Q. -- from day to day.**
A. The great majority of them are straight-through transactions.
**Q. And can you just give me a number, approximately?**
A. How about a percentage?
**Q. Okay.**
A. Ninety-five percent.
**Q. Okay. So 95 --**
A. So 95.5. Ninety-five percent straight through, five percent repair, approximately.
**Q. Okay.**
MS. RUBIN: And does that five percent exclude OFAC?
THE WITNESS: Yes, it does. So I'm talking about repairs because of the format of the wire, not because an operator was involved with the screening of the sanctions or sanction screening compliance.
BY MR. CROCKETT:
**Q. And we'll go through OFAC compliance --**
A. Sure.
**Q. -- but as I understand your interrogatory answer, 100 percent of the wires go through OFAC**



**screening?**
A. Yes. Yeah, that's -- that's a requirement, right, compliance requirement. Now, something less than 100 percent -- well less than 100 percent actually have operator intervention, right? So --
**Q. Okay. We'll go -- we'll get -- we'll go there, but thank you --**
A. Okay.
**Q. -- thank you for -- for clarifying that.**
**Okay. So 5's covered.**
**Let me look at Number 6. "Wells Fargo's position in this case on whether James Messenger -- James H. Messenger, Jr., Esquire, and Chris Achebe are the same persons or different persons."**
**Does Wells Fargo recognize that the two are different persons?**
MS. RUBIN: Just for the record, he's not here --
THE WITNESS: This was not --
MS. RUBIN: -- to testify about Chris Achebe. I'm sorry if I didn't -- anything has to do with Chris Achebe, he didn't get involved in the Chris Achebe account.
MR. CROCKETT: Okay.



BY MR. CROCKETT:
**Q. And again, you -- you can say, "I don't know" --**
A. Okay.
**Q. -- if you don't know; I mean, I'm not --**
A. All right.
**Q. I can't tell you how to answer. I'm just asking questions.**
A. Yeah, I -- I wasn't -- I don't know.
**Q. Okay. Do you -- do you have any reason to believe that the report made by my client, Shapiro, P.A., that the -- they were the victim of a fraud was not correct?**
MS. RUBIN: Object to the form --
THE WITNESS: I don't know.
MS. RUBIN: -- haven't seen the document.
BY MR. CROCKETT:
**Q. Okay. Exhibit 7 -- pardon me, Question 7 relates to the notification of incoming funds by Mr. Achebe. I -- your client -- your counsel has said you're not here to address -- to address that issue, but as a -- as a general matter, do you know who -- who at Wells Fargo would -- would advise the account holder of an incoming wire?**
MS. RUBIN: Excuse me. Maybe I misspoke



before. I had written here to say Number 6 he's not here on.
MR. CROCKETT: Oh, you said 6 instead of 7?
MS. RUBIN: Yeah. Did I say it wrong? Seven he can tell from the documents, if that's what you want to know, when --
MR. CROCKETT: Okay.
MS. RUBIN: -- it came in to his account. So he could testify from the documents when it came in.
I'm sorry -- if I read it wrong, I'm sorry.
BY MR. CROCKETT:
**Q. Okay. All right. Forget about the -- what I said that you -- that you wouldn't know -- wouldn't know --**
MS. RUBIN: Sorry.
BY MR. CROCKETT:
**Q. Do -- do you know -- do you know whether Wells Fargo notified the account holder on or soon after November 21, 2017, of the receive of a $504,000 wire?**
A. Well, Wells Fargo made that information available to the account holder. Okay. And then

Page 30

it's up to the account holder to access that information, either through on-line banking or through calling an 800 number. So the credit is posted to the -- to the account, but it's up to the account holder to access the account and -- and recognize that it's there and what the details are.

**Q. Okay. So it's -- as applied to -- to this particular case, there was no -- there was no email or --**

A. There was no advice sent to -- to the customer.

**Q. Okay.**

A. Certain customers request that, but this one didn't.

**Q. And when you say "was up to the customer to look," you mean the customer had the email access to his --**

A. Not email, but on-line.

**Q. On-line access to his -- to his account information?**

A. Yes.

**Q. Does the Wells Fargo system keep track of when a customer accesses their account on-line?**

A. I wouldn't know that.

**Q. Okay. All right.**

Page 31

MS. RUBIN: To the extent he was not identified as a corporate rep on that topic.

MS. CROCKETT: No, "I don't know" is fine.

MS. RUBIN: No, I'm just -- 'cause I'm telling you, I think Wells Fargo would know the answer that. So it's not Wells saying that, it's --

MR. CROCKETT: No, I --

MS. RUBIN: -- Mr. Ansbro saying that.

MR. CROCKETT: Okay. I appreciate that.

MS. RUBIN: That's all.

MR. CROCKETT: I appreciate that clarification.

BY MR. CROCKETT:

**Q. Okay. Question 8 is, "What did -- what did Wells Fargo do following a request for recall of the wire transfer from -- from Citibank"?**

A. Right. So we -- upon receipt of the recall request, we recognize that the funds were no longer in the account, and we advised Citibank that we could not honor their recall request.

**Q. Were you involved in that transaction at all?**

A. No, that's -- that -- that -- that's our

Page 32

investigations area which happens to report to a peer of minor.

**Q. Okay. And -- and do you know who handled that call in the investigations area?**

A. I do not.

**Q. Okay.**

A. It wasn't a call, it was a -- an electronic message. It's actually a SWIFT message.

MR. CROCKETT: Okay. Okay. And you said you -- you -- am I right, Counsel, this gentleman is not here to testify about the Chris Achebe account?

MS. RUBIN: Correct. That's what he's not here...

MR. CROCKETT: Okay.

MS. RUBIN: That's basically --

BY MR. CROCKETT:

**Q. So you don't know whether Chris Achebe's a real person or not?**

A. No, sir.

**Q. Okay. Okay. There -- there -- my client has said -- Mr. Peter Shapiro of Shapiro, P.A. has said he's called Wells Fargo to report the fraud, had a conversation with an individual in the -- in the wire transfer fraud area.**

Page 33

**And my question is: Do you -- does Wells Fargo record all such calls?**

A. I don't know.

**Q. Okay. Do you know whether -- do you know what efforts Wells Fargo has made to look for the transcript or recording of that --**

A. I do not.

MS. RUBIN: Objection. Outside the scope.

BY MR. CROCKETT:

**Q. Okay. All right. And again, I'm asking you so that we -- we can fought through other people in --**

A. I understand.

**Q. -- Wells Fargo that -- that may have the answer to that.**

**Okay. So you -- you can't address what Wells Fargo did or didn't do to look at the records of calls made on December 14th?**

A. I cannot.

MS. RUBIN: Same objection.

BY MR. CROCKETT:

**Q. Okay. Do you know whether there's -- there are transcripts or whether the calls are searchable?**

A. No.
MS. RUBIN: Same objection.
BY MR. CROCKETT:
**Q. Okay. All right.**
MS. RUBIN: The only reason I'm making it, and I don't really want to be a pain, so as long as you --
MR. CROCKETT: No, no, it's fine.
MS. RUBIN: -- continuing it's fine, it's just that I get nervous on corporate reps that people then say, "Well, you, therefore by not making an objection, are saying Wells Fargo doesn't know." And I realize that you --
BY MR. CROCKETT:
**Q. No, I -- I -- I think -- I think it's clear, I can ask you --**
MS. RUBIN: Right.
BY MR. CROCKETT:
**Q. -- I can ask you non-designated questions, and you may or may not know the answer; but, yeah, it's not Wells Fargo's answer for sure.**
MS. RUBIN: Okay. That's fine. That's fine.
BY MR. CROCKETT:
(PLF. EXH. 2, DOCUMENT BATES STAMPED



WELLS FARGO SHAPIRO 500 - 507, was marked for identification.)
**Q. Okay. All right. So I'm going to show you, you can -- you may or may not be an expert in this, you may not be the guy -- I'm showing you what's been marked as Exhibit 2. These are Wells Fargo documents produced regarding the -- what I would say is regarding the investigation or some investigation pertinent to this case.**
**Have you -- have you seen the contents of Plaintiff's Exhibit 2?**
MS. RUBIN: Object to the form. Outside scope.
MR. CROCKETT: Okay. So you -- and you can say your -- your statement is he would not be the corporate representative --
MS. RUBIN: Correct.
MR. CROCKETT: -- to address this document?
MS. RUBIN: Correct.
BY MR. CROCKETT:
**Q. Okay. All right. So -- so I'm -- I'm just -- you're -- you're -- you're not speaking on behalf of Wells Fargo. I'm just asking you quest- -- what you may know about this document to**



**help me in -- in -- in understanding it.**
**Do you -- have you seen this document?**
A. I've seen parts of this document, not the whole thing.
**Q. Okay. Which part are you familiar with?**
A. Some of the chronology here I've -- I've seen.
**Q. So pages -- page 503 through 507 you're familiar with?**
MS. RUBIN: And for the record, that was from me to find out if he knew about it.
MR. CROCKETT: Okay.
BY MR. CROCKETT:
**Q. Okay. So you -- your counsel asked you if you had seen it before, essentially?**
A. Right.
**Q. Okay. All right. So -- so at that time, which you said was in the past few weeks, would be the first time you learned about the -- the various reports of -- of fraud --**
A. Yeah --
**Q. -- and investigation?**
A. -- of -- of all the relevant actions here that were not part of the wire transfer. I -- I -- you know, I only knew that -- of the one wire



transfer, the $504,611.13 on November the 21st.
**Q. The -- the pages that you mention, 503 through 507, who created those within -- within Wells Fargo?**
A. I do not know.
**Q. Do you know what area created them?**
A. I do not know.
**Q. Okay. What is BEC fraud? Capital B, capital E, capital C fraud, if you know?**
A. It's -- it's a common acronym we use for Business Email Compromise.
**Q. There's -- on page 501, which is the second page of Exhibit 2 -- there's a name Mr. Mehtani, M-E-H-T-A-N-I; you see that? The officer who opened the --**
A. Oh, I see that, yes.
**Q. -- who -- who was involved in opening the Achebe account.**
**Are you -- do -- do you know that person?**
A. No, sir.
**Q. Okay. Do you know whether the person still works at -- at Wells Fargo?**
A. I do not.
**Q. All right. Do you interpret the first page of Exhibit 2 to indicate that this particular**

**account holder, Mr. Achebe, was -- had a Nigerian passport and worked for a trucking company?**
MS. RUBIN: Object to the form.
THE WITNESS: I can't speak to this. I'm not familiar with the first page.
BY MR. CROCKETT:
**Q. Okay. All right. So when -- when is the first time that you learned that five days prior to the $504,000 wire transfer at issue in this case, a 30,195 wire transfer was deposited in Achebe's account intended for another beneficiary other than Achebe?**
A. Just within the last week or so. I -- I don't even remember the exact date that I became aware of that, but not --
MS. RUBIN: And let me --
THE WITNESS: -- very recently.
MR. RUBIN: -- and I'll object to the form of that question. He became aware that this document existed that says what it says.
BY MR. CROCKETT:
(PLF. EXH. 3, WIRE DETAIL SUMMARY, was marked for identification.)
**Q. Okay. Okay. I'm going to show you what we will mark as Exhibit 3. I believe we've asked**



**you in interrogatory what -- what this was, and you said this was a wire detail summary?**
A. Uh-huh.
**Q. Am I right?**
A. Yes.
**Q. Okay. And you said that it was generated on November 21, 2017?**
A. So -- so it's a -- it's a printout of a system record. Okay. The system record was created sometime subsequent to November 21st, probably the same day, could be the next day. But when this document was printed out, you know, I -- I -- I -- I can't tell.
But the system record itself was created after the processing day is completed, that's when the record is -- is created by -- by another system, right? So this is the storage -- the transaction storage and retrieval system that has this record of the transaction.
**Q. Okay. So -- so let me unpack some of that.**
A. Sure.
**Q. This document is created by the transaction storage and retrieval system?**
A. This -- this -- this record is from the



transaction storage and retrieval system. It's a printout of a screen print from that system.
**Q. Okay. And what is -- what is -- does that system have a name?**
A. AXCIS, A-X-C-I-S.
**Q. A-X-C-I-S. Okay.**
**And that's a system internal to Wells Fargo?**
A. Right.
**Q. Is -- is that the -- AXCIS keeps that record in the ordinary course of Wells Fargo's business?**
A. That's correct.
**Q. And it's the regular practice of Wells Fargo to create such records as Exhibit 3?**
A. Yes.
MS. RUBIN: Object to the form.
BY MR. CROCKETT:
**Q. Is -- there's a routine procedure for creating these records?**
A. It's an automated procedure, right? The system does it all automatically.
MS. RUBIN: If you want us to stipulate this is a document of the company business record, we're happy to stipulate to that.



MR. CROCKETT: Okay. Well, that would help. Sure.
BY MR. CROCKETT:
**Q. It's a business record of Wells Fargo, correct?**
MS. RUBIN: But just so you know, I mean, it only gets printed out if somebody asks for it. It's -- it's in the computer otherwise.
MR. CROCKETT: Right.
BY MR. CROCKETT:
**Q. Okay. So -- so -- but -- but the information on it is -- is accurate?**
A. Yes.
**Q. And that's -- it's -- it's -- Wells Fargo maintains this information for whatever business purposes there may be?**
**Anytime there's a need to look up any of this information, Wells Fargo routinely accesses it?**
MS. RUBIN: Object to the form of that question, what the purpose of this is kept for.
If it could help, go ahead.
BY MR. CROCKETT:
**Q. You can answer the question.**
MS. RUBIN: Yeah.

THE WITNESS: Could you repeat it, because...
BY MR. CROCKETT:
**Q. Is -- is there a business purpose for Wells Fargo maintaining --**
A. Yes.
**Q. -- the information?**
A. Yes.
**Q. Tell me what the business purpose is.**
A. Well, at least two I could think of: One is for compliance purposes, right? For compliance with the bank secrecy acts. You want to be able to have a record of the incoming and outgoing transactions and the details.
And the other is to answer questions about it. So that if you get a recall request or if you get -- if you get an inquiry from a customer related to the transaction, that you can access the record and hopefully respond to the inquiry.
**Q. Okay. So -- so Exhibit 3 is -- is -- is based on wire -- pardon me, accurate information about wires that is pieced together from the Wells Fargo wire transfer system; is that right?**
MS. RUBIN: Object to the form of that.
THE WITNESS: It's -- it's -- it's a



record of the details of the transaction that was processed.
BY MR. CROCKETT:
**Q. Okay. And -- and what is the source -- and again, if the -- if the source is different for different items of information, we can go over that -- but what is -- what is the source of the information contained on Exhibit 3?**
A. It's the -- the MTS application, the wire transfer system. The detail from that system is -- is transferred to the transaction -- to access the storage and retrieval system where it stays -- it's for long-term retention.
**Q. Okay. So is -- is the MTS system cleared in some manner and the information's stored in the AXCIS system?**
A. Yeah. So -- so the data temporarily stays on the MTS system for about a month, and then after that time it roll -- it rolls off of the MTS system. So for that month or so it's maintained in both places.
And then after -- after it rolls off the MTS application, it's still maintained in the AXCIS transaction storage and retrieval system.
**Q. So clearly, the -- the information is**



**accurate and contemporaneous even though this is a computer generated --**
A. Yes.
**Q. -- document?**
A. Yes.
**Q. Okay. All right. So I'm just going to go over this document, and there's a number of abbreviations on there --**
A. Yeah, of course.
**Q. -- that hopefully you can -- you can shed -- shed some light on.**
**Looking at the top we -- we say "Message Envelope"; what does that refer to?**
A. That just is our -- our way of saying that that's the beginning of the data, so what -- what -- what appears below that is -- is the -- the --
**Q. So it's --**
A. -- record of the transaction.
**Q. So this is new transaction, in other words?**
A. Yes.
**Q. Okay. Next or whatever.**
**Okay. "Bank 121," what is -- is that Citibank?**



A. No. No. So that's -- that refers to the -- the only bank -- Wells Fargo is the only bank on the system now. There used to be multiple banks on the system in the -- you know, before they were all consolidated into one. So that field is still present there even though it's -- there's only one bank --
**Q. Fine.**
A. -- now.
**Q. Perfect. Okay.**
**Am I reading correctly, "Send date November 21, 2017"?**
A. You are.
**Q. Okay. And it's in year first and then month, day.**
**Okay. There's -- then we see the amount of the wire, report number with nothing, amount of the wire?**
A. Yeah, that's -- RPT number is -- that's -- it's an abbreviation for repetitive number, and it's blank because it's not a repetitive transaction.
**Q. Okay. All right. If we look at the -- we see a dash, and then below that we see DRTA02100089; what does that mean?**

Page 46

A. That's DBT A/021000089. That is the ABA number, the Fedwire routing number for Citibank. Okay. And in this case, that's recorded as the debit party in this transaction. The debit, in fact, is to general ledger account that corresponds with the Fedwire system.

But that's a DBT, indicates that's the debit side of the transaction, which in this case is a -- a general ledger account that is connected to CitiBank's ABA, and all other ABAs for incoming Fedwire transfers.

**Q. Okay. And if we look below that there's a debit value and amount. And what does CTYP mean?**

A. That's a currency type, and if -- if there were currency other than U.S. dollars, it would be reflected there.

**Q. Okay. Going over to the right there's a CDT and -- with an account number; that's the Achebe account, correct, 0445 at Wells Fargo?**

A. Yes. That's -- so that's the credit side of the transaction. That's what CDT is.

And then the "D /" means what follows is a DDA, a Demand Deposit Account number, zero filled on the left, and then beginning with 7414400445 is the account that was credited in this transaction.

Page 47

**Q. And Demand Deposit Account is what's --**

A. Checking account.

**Q. -- commonly called the checking account. Right.**

**And then the next -- just continuing to the right further, "ADV:LTR"; what does that mean, sir?**

A. That would be an advice. And in this -- if there were an advice sent, that would be the way it would -- would be sent, through a letter or mail advice, but that did not occur in this case.

**Q. You mean to the account holder?**

A. Sorry?

Yes.

**Q. To the account holder?**

A. Yes.

**Q. Okay. So even though it says "LRT," there's -- there's -- there was no L- -- there was no letter in this case?**

A. That's right, there was not.

**Q. Okay.**

A. If the -- if the --

**Q. And you know that how?**

A. Because I -- because customers have to -- well, there's another document that has -- would

Page 48

have shown it being created if it was.

And customers have to opt in to that service, right. So if they want to get a mail advice when they get an incoming wire transfer, we send it to them; but they have to opt in for that, and they have to pay for it.

**Q. Okay. So you know from other documents the customer here did not ask for that?**

A. Yes.

**Q. Okay. All right. So then we see the same -- the same amount, 5-0- -- $504,611.13. So the -- that's the amount that was ultimately deposited in the account, correct?**

A. Right, the amount of the debit or the amount of the credit are the same amount.

**Q. And below that there's Chris Achebe, A-C-H-E-B-E, the name; the address, 7421 Burnet Road, Number 132, Austin, Texas with a zip code.**

**What was the source of that information?**

A. From our HOGAN system. That's where that name and address corresponding with that account number was stored.

**Q. Okay. And so this -- this information was accessible to the MTS system through the HOGAN system?**

Page 49

A. That's -- yes, that's how the -- there's an automated interface called Autotrieve between MTS and HOGAN where that information is retrieved.

**Q. Okay. Continuing further down there's a -- well, I guess we should go over to the left. At the left there's a -- there's a Department 0002729 and CitiBank's New York address. What -- do those refer to -- is that CitiBank's numbers?**

A. No. So that department refers to the department that owns the general ledger account that was -- that the -- the debit side of this transaction.

And that the number above it there, "GL Recon," that's the -- that's the general ledger account number. So that number and that department together identify the -- where the debit was posted for -- for this incoming Fedwire transaction.

**Q. So essentially, the money came from Citibank?**

A. The money came from Fedwire. So Fedwire could be Citibank or any other bank that's a member of Fedwire.

**Q. Okay. But -- so when -- when the incoming wire will have information that Citibank is the bank which it will be funding it through the**

**Fedwire system --**
A. Right.
**Q. -- am I right? Okay.**
A. Yes.
**Q. All right. Continuing on the left side there's -- there's a BNF with the same -- the same account number --**
A. On the right side you mean?
**Q. Yes. Yep.**
A. Yes.
**Q. "BNF 741400445."**
**And BNF means what?**
A. Beneficiary.
**Q. And that -- that should be the same as the credit party, correct?**
A. It's the same as the credit --
MS. RUBIN: Object to form.
Go ahead.
THE WITNESS: It's the same as a credit party when the account number provided refers to the -- the name provided by the -- in the incoming wire. So in this case it's not.
BY MR. CROCKETT:
**Q. Okay. So -- and you can tell from Exhibit 3 -- one can tell from Exhibit 3 that the**



**beneficiary party and the party to be credited were different parties?**
A. I can't tell it from this -- from this document. There's another document that I think we're going to talk about that I can tell it from. But I can't -- what -- what this document doesn't show is the way the wire came in from Citibank. It shows the way the wire looked after it was processed, but not the way it came in. So that's what I would need to see to explain that part to you.
**Q. Okay. Is -- is there -- but this -- is the BNF, beneficiary party, identified as James H. Messenger, 440 South Warren Street, Suite 703, Syracuse, New York?**
A. It is.
**Q. Okay. So facially there's no similarity between Mr. Achebe in Texas and Mr. Messenger in New York, correct?**
A. I don't know that.
**Q. Okay. Do -- if -- if -- if one of your operators were aware of this information, based on your earlier testimony, this would be a wire that would be sent back to Citibank, correct?**
MS. RUBIN: Object to the form.



THE WITNESS: If I could see the way the wire came in, if I could -- that's what -- that's what I'd have to see and sort of be referring to in order to answer that -- that question.
Just looking at it from this way, you know, the finished product, this is the way the transaction looked when it was completed. I -- I -- I don't have enough information to -- to make that judgment based on this document alone.
BY MR. CROCKETT:
**Q. Okay. Isn't it a fact though from everything you've looked at that the information that James Messenger was the intended beneficiary came from the Citibank wire?**
A. No. I think the -- the -- the account number from the Citibank wire is the account that was credited; and, you know, subsequently I found out that that wasn't the intended beneficiary, but there's no way to know that at the time the wire was credited.
**Q. Okay. Unless -- unless Wells Fargo had examined the fact that James Messenger was listed as the intended --**
A. Right, --
**Q. -- beneficiary on the wire?**



A. -- unless -- unless there was a repair of the transaction involved, then we would have gained that knowledge, we would have had the opportunity to gain that knowledge; but it wasn't, so we didn't.
**Q. So the -- you would agree that the Wells Fargo MTS system at the time of receipt of this wire contained both the information that Chris Achebe was the account holder at Wells Fargo and that James Messenger of Syracuse, New York was the intended beneficiary?**
A. I would say the ultimate beneficiary, yes.
**Q. Okay. So is it -- is it your testimony that when Wells -- that despite that Wells Fargo has programmed the MTS system to ignore the fact that the intended actual beneficiaries are different persons?**
A. The system is programmed so that if the -- the -- the account number is a valid match, that's all that matters. That's the account that gets credited regardless of what the name says.
**Q. Okay. And implicit in that is it is programmed to ignore mismatches between the intended and actual beneficiary?**

A. Differences in the name, yes.
**Q. Okay. So the -- it is -- it's -- it is --**
MS. RUBIN: Let me -- let me object to the form. I think you asked a jumbled question there.
BY MR. CROCKETT:
**Q. Well, let me -- let me -- let me follow up: Is it -- is it also correct that the system is programmed to not even divert to the repair area a situation in which the MTS system is aware that the -- there's a different name from the intended and the actual beneficiary?**
MS. RUBIN: And let me just object to the extent that -- and I'm not sure what the answer is -- that it assumes that it's programmed to ignore something.
But go ahead.
THE WITNESS: So the system is programmed so that if the account number is valid, it doesn't matter what the name says. Okay. So if -- if it's a valid account number that's in the right field, then that's the account that -- that -- that gets -- that gets credited.
It does not get routed to -- the



transaction does not get routed to repair queue because the account number is valid and -- and that is assumed to be the intended beneficiary.
BY MR. CROCKETT:
**Q. Okay. You're using the present tense, so am I understanding from that that the policy on, you know, on November of 2017, is still the policy today?**
A. Yes.
**Q. There hasn't been any concern about the fact that even though the MTS system is identifying different names from the credit party and the beneficiary, that -- that that's something that needs to be examined?**
A. No. There's no -- that's been in place for decades like that.
**Q. But you do agree, based on the answer to the first question I asked you, that if one of your repair employees were looking at this information, they would certainly not say, "No problem. Pay this"?**
A. Right. And the hypothetical situation that you're presenting, yes, if one of my repair operators recognized that the name and the number identified different parties, they would -- you



know, their -- the procedure they would follow would be to question that; and by questioning it, it results in the return of the -- of the funds to the sending bank.
**Q. Okay. So let me just follow on with my --**
A. Sure.
**Q. -- CLE course and --**
A. Okay.
**Q. -- Continuing Legal Education course in understanding this document.**
A. Okay.
**Q. The -- the -- the bottom line on the left says S -- "SNDR reference number"; is that a -- is that a Citibank reference number --**
A. It's a number that Citibank provided; whether it's their reference number or their customer's number, I can't tell from -- from -- from this, but it's a number that Citibank provided. It's not meaningful to me.
**Q. Okay. So this is just some- -- something that was in the Citibank wire instructions --**
A. Yes.
**Q. -- it was --**
A. It's a mandatory field. They have to



have something in there.
**Q. It was copied to the MTS system automatically?**
A. Right.
**Q. Okay.**
MS. RUBIN: AXCIS system.
BY MR. CROCKETT:
**Q. And the -- the -- there's a telephone number to the right -- well, there's something "ORIG to BNF Info," and then there's a telephone number; do you know what that refers to?**
A. Yes. So originator to beneficiary information, that's that field, okay, and it's information provided by the sending bank for -- for -- to be passed on to the beneficiary from the originator. Okay. So that, hence, originator to beneficiary information.
So it's information that the originator provides through the banks to the beneficiary in order to help the beneficiary apply -- apply the funds to know what the purpose of the transfer was for.
**Q. So it -- it might be account number that the sender has with the beneficiary, for instance?**
A. It could be anything. We don't interpret

Page 58

it --
**Q. Correct.**
A. -- we just pass it on.
**Q. Okay. All right. And continuing to the second page.**
A. Sure.
**Q. It says, "Ordering bank, Citibank, and Doral, Miami," is -- is that -- what do you interpret to mean?**
A. I take that to be the branch at Citibank from which the originator initiated the wire.
**Q. Okay. And the -- the same on the right side at the top of page 2, we see "Peter E. Shapiro, P.A., Attorney Trust." What's your understanding of that? Would that be the -- the sender, the sender's information as you understand it?**
A. Yes.
**Q. Okay. And the similar name, you know, the P.A. is under the ordering bank; do you understand that to mean that --**
A. It's the originator.
**Q. Okay. It is. And that's the same thing as a sender in the -- in the wire transfer world?**
A. Not exactly, but pretty much the same,

Page 59

yeah.
(PLF. EXH. 4, DOCUMENT BATES STAMPED PS 18 - 19, was marked for identification.)
**Q. Okay. All right. I'm going to show you what we'll mark as Exhibit 4.**
**Pardon me, I took the wrong number.**
**This is yours, Counsel.**
**Are you familiar with Exhibit 4, sir?**
MS. RUBIN: I have two. (Tendered)
THE WITNESS: Generally, yes.
BY MR. CROCKETT:
**Q. Okay. What is it?**
A. It's information we provide to our customers -- Wells Fargo provides to our customers to help them process in the process of initiating or receiving wire transfers.
**Q. At the -- at the time -- in approximately December of -- of last year, this was on the web for -- for -- you know, the website of Wells Fargo; is that -- is it still on the -- the website --**
MS. RUBIN: Object --
BY MR. CROCKETT:
**Q. -- to the best of your knowledge?**
MS. RUBIN: Outside scope.
Go ahead.

Page 60

THE WITNESS: It may be; I mean, it doesn't -- it changes, it doesn't change very frequently, so I -- I can't say for sure --
BY MR. CROCKETT:
**Q. Okay.**
A. -- what's there now is the same as what was there then. No, I'll just leave it there.
**Q. Okay. Yeah, so -- yeah, and you don't have to be -- what's the word -- an encyclopedia of every change -- every change made to the website.**
**Okay. But you do recognize this is information that Wells Fargo makes available to its customers as of the time of the wire in this case?**
MS. RUBIN: Object to the form. Outside scope and this person's knowledge when it was in effect.
BY MR. CROCKETT:
**Q. No, this is just your personal knowledge, do you recognize --**
A. I'll just tell you that I recognize the document, and it -- and it looks very much like the -- the document that we provide to our customers to help them initiate and process or receive wire transfers.
**Q. Okay. So -- so I will direct your**

Page 61

**attention to the third column of the first page entitled -- there's a title "For Receiving Wire Transfers in U.S. Dollars"; do you see that?**
A. I do.
**Q. Okay. "To avoid processing delays" -- I'm just reading the document -- "please use the following routing instructions for incoming wire transfers," and includes beneficiary account name and address.**
**Why -- why does Wells Fargo require that information?**
A. It's required by -- for Fedwire transfers it's required by the Fed. You have to have a beneficiary name -- name and address. It's a mandatory field.
**Q. Okay. And for purposes of clarification, I think that's implicit in what you're saying: The wire in this case from Citibank to Wells Fargo on November 17th was sent through the Fedwire system?**
A. Yes. That's correct.
**Q. Okay. And the -- when you say "it's required," does that mean if the information were not there the wire would not be accepted?**
A. It wouldn't be accepted by the Fed. So the Fed would reject it to the sending bank. Would

never make it to the receiving bank.
**Q. Okay. So is -- is your understanding that's the process in delay that's -- that's referenced in this -- the wire -- as I read this this says, "The purpose of including the beneficiary name" --**
A. Oh, so if that's --
**Q. -- "to avoid processing delay."**
A. -- to avoid the delay, yes --
**Q. It won't go through.**
A. Right. Right.
**Q. So it would have to --**
A. It would just delay it, yeah.
COURT REPORTER: I'm sorry. You're over each other.
THE WITNESS: There I go again.
BY MR. CROCKETT:
**Q. She's correcting us again. That's okay.**
**All right. And go, if you would, to the second -- the second page. The very first line says, "Reduce the possibility of delays, additional fees, or loss of principal on outgoing wires."**
**This is -- this is -- what's your understanding of that --**
A. So when --



**Q. -- what that's for?**
A. -- for sending outgoing wires, you always want to make sure that you have the -- the beneficiary's complete name, address, and account number, particularly if they're going outside the country; but even if they're going inside the country, it's -- it's required for compliance with the Bank Secrecy Act.
(PLF. EXH. 5, CONSUMER ACCOUNT APPLICATION, was marked for identification.)
**Q. Okay. We'll move on. I lost my...**
**Okay. I'm going to show you what's been marked as Exhibit 5. Your counsel has already told me you're not the right person to testify on -- on this on behalf of Wells Fargo.**
**So I'm just going to ask you if you recognize this as an application for an account opening.**
A. I do not.
**Q. Okay. You recognize the form, but you don't know anything about this particular application?**
A. Both. Neither. I've not --
**Q. You're not even aware of -- of account applications?**



A. Right.
**Q. Okay. All right. And where are we? We're 5 --**
MS. RUBIN: Six.
MR. CROCKETT: Okay.
BY MR. CROCKETT:
(PLF. EXH. 6, CONSUMER ACCOUNT AGREEMENT, was marked for identification.)
**Q. I will show you the Wells Fargo app- -- these account terms, which we're marking as Exhibit 6.**
MS. RUBIN: Effective April 24, 2017.
MR. CROCKETT: Correct. As of -- as of -- produced by Wells Fargo as the account terms as in effect in November of 2017.
MS. RUBIN: Okay.
BY MR. CROCKETT:
**Q. Is -- is -- are you familiar with the -- the fact that this is the customer account agreement -- agreement that all customers at Wells Fargo --**
A. Not personally, no.
**Q. -- accept?**
**Okay. All right. Do -- do -- I'm assuming you have such an account with -- with**



**Wells Fargo?**
A. Personally, yes, I do.
**Q. And have you ever looked on-line at what it was you were agreeing to?**
A. No.
**Q. Making you a typ- -- a typical -- a typical consumer.**
**All right. So that's Exhibit 6.**
(PLF. EXH. 7, DOCUMENT BATES STAMPED PS 7, was marked for identification.)
Okay. I'm going to show you Exhibit 7. This is not a Wells Fargo document, sir, this is -- this is what the sender, in this case Shapiro, P.A., received from Citibank as a completed wire record.
So this is -- this is, if you will, a Citibank record --
A. Okay.
**Q. -- given to -- you know, given to my client.**
**Are you familiar with documents of this -- of this format?**
A. No.
**Q. Okay. All right. Do you -- do you see the beneficiary identified as James H. Messenger of**

Page 66

**Syracuse, New York, that information matches what we saw in Exhibit 3; does it not?**
A. I'd have to go back to Exhibit 3 --
**Q. Go ahead, if you...**
A. I mean --
**Q. You can refresh your recollection --**
A. Okay.
**Q. -- this is...**
A. Yeah, that matches the -- the -- the name, address, and beneficiary account number match what's in the beneficiary field on Exhibit 3.
**Q. Okay. Thank you.**
**Okay. We're about to go to another area. Do you mind if we take a five minute break?**
MS. RUBIN: That's fine.
VIDEOGRAPHER: We're going off the record at 1:19 p.m.
(A recess transpired.)
VIDEOGRAPHER: We're going back on the record at 1:31 p.m.
BY MR. CROCKETT:
(PLF. EXH. 8, GSMOS PROCESSING DOCUMENT, was marked for identification.)
**Q. Okay, sir. I'm going to show you what has been marked as Exhibit 8, which is procedures**

Page 67

**relating to what -- as I understand it, the sanction screening.**
**Exhibit 8. (Tendered)**
**Are you familiar with that document?**
MS. RUBIN: You gave him two.
THE WITNESS: Yeah, you gave me two copies here.
BY MR. CROCKETT:
**Q. Oh, I gave you two copies. Okay.**
A. Yes, I'm -- I'm familiar with this.
**Q. Okay. And -- and this is the -- the policies for Wells Fargo's OFAC review at the time of the transaction in this case, correct?**
A. I would call it a procedure, not a policy.
**Q. Okay. It's a -- well, this document is Wells Fargo's procedures for the OFAC sanctions review as of --**
A. Yes.
**Q. -- November of 2017, correct?**
A. Yes.
**Q. Okay. All right. Now, you have stated that one person was involved in that review, and in this particular case that is Riko Ong, correct?**
A. Correct.

Page 68

**Q. What -- what is his age?**
A. I do not know.
**Q. Okay. Can you give me an approximation?**
A. No.
**Q. Okay.**
A. He's an adult. Does that help?
**Q. Okay. Okay. It's not a teen-ager.**
**Do you know how many years Riko Ong has worked for Wells Fargo?**
A. I've known him for 15, so at least 15.
**Q. Okay. So this is -- this is a 40-plus-year-old person?**
A. Yeah. And a tenured employee.
**Q. Okay. What training does a -- would a person -- let me -- let me ask: The position is called OFAC reviewer or what's the title?**
A. Sanctions -- OFAC sanction screener.
**Q. Okay. OFAC sanction screener. What training does an OFACS -- OFAC sanction screener have at Wells Fargo?**
A. Well, he --
MS. RUBIN: Object to the form.
THE WITNESS: -- he -- he or she has training for processing in the GSMOS, G-S-M-O-S, system. GSMOS is the Global Sanctions Monitoring

Page 69

Operations System, and that system is designed to ensure compliance with the regulatory sanctions, such as those that are administered by OFAC.
And in that -- in GSMOS, the operators are trained to recognize when a possible match to a sanctions violation needs -- is -- is a false hit or if it's something that could possibly be a true match, in which case it is escalated to our -- our global sanctions office where a final decision is made as to whether it is a true match or something that could be cleared or something in the middle, which is, "We need more information to determine that."
BY MR. CROCKETT:
**Q. Okay. Now, the -- you pronounce it like gizmo?**
A. GSMOS, yeah.
**Q. Like a --**
A. Yeah. Yeah.
**Q. -- just as a thing?**
A. Phonetically. Yeah. Yeah.
**Q. Okay. And has this same system or this same procedure been in effect for 15 years?**
A. No. We -- it -- this one's been in effect for about five years because -- well, four

or five years ago we did sanction screening on -- on the MTS application itself.

As of about, I'll say, four or five years ago, we converted to using a -- an enterprise-wide system for -- for -- for compliance and sanction screening, and that's what GSMOS is. It's a -- it's used for sanction screening throughout the bank, not just for wire transfers.

**Q. Now, this particular screening was done in Hong Kong rather than one of the other three locations, can you tell me why?**

A. Because the transactions are -- are screened on a first in/first out basis. So the staff in Hong Kong works sort of virtually alongside my staff in the other three U.S. locations, and whichever -- soon as they complete one transaction, the next one pops up and they're prompted to work on the oldest one first.

And so when they finish one transaction, the next one pops up and -- on their screen and they're -- they work on that one next.

**Q. Okay. So it wouldn't -- so if it had come in two minutes later, it might have been done in another office?**

A. Yes, it's just random -- random



coincidence or random -- the -- the way the transactions are routed it's whoever's next, you know, who's ever -- whoever just completed one gets the -- the -- the next oldest one.

**Q. Does Riko Ong -- Ong have any other duties other than being a sanction screener?**

A. No. No. That's his sole function.

**Q. Okay. Now, is -- I think you said you're familiar with Exhibit 8, correct?**

A. Yes. The procedures, yes, by all means.

**Q. Does -- does Exhibit 8 accurately state the procedures that Wells Fargo employed at the relevant time --**

A. Yes.

**Q. -- for sanctions review?**

A. Yes.

**Q. Okay. And you work with this document in the ordinary course of your business?**

A. Yes.

**Q. Okay. So if you could go -- and now I'm referring to the little numbers on the bottom of the page -- Wells Fargo 519; you see that? It's approximately the third or fourth page of the document.**

MS. RUBIN: Here. (Indicating) These



pages.

THE WITNESS: I got it.

MS. RUBIN: Okay.

THE WITNESS: Introducing Office of Foreign Assets Control.

BY MR. CROCKETT:

**Q. Correct. Page 4 of -- of the policy and procedure manual. Okay.**

**This -- this appears to state that on all wire transfers, Wells Fargo, to comply with OFAC, Office of Foreign Assets Control Regulations, looks to see whether the recipient is on a list of specified countries, entities, and individuals; do I have that right?**

A. Not just the recipient, but all of the details, any of the details of the transaction. So it could -- it applies to the beneficiary, but it also applies to the originator, also applies to the originator, the beneficiary information.

Any -- any place in the -- the entire details of the transaction that is received are scanned against the various sanctions list.

**Q. Okay. And again, that's a -- that's a -- is that an automated function?**

A. Yes. Very much so.



**Q. Okay. So -- so just tell me a little bit about how -- how a person might make it onto the OFAC list?**

MS. RUBIN: Objection. Outside the scope.

THE WITNESS: I wouldn't know; I mean, all I do is see what's there, and -- you know, what they do to deserve to be on that list is not something I'm privy to.

BY MR. CROCKETT:

**Q. Okay. Well -- and again, I'm not suggesting you would have personal knowledge, but if you look at the policy, this same page we're referring to, it says, "There are targeted foreign countries, global terrorists, international narcotics traffickers, and entities engaged in activities relate to the proliferation of weapons and mass destruction."**

**And is it your understanding that the government agency OFAC creates a list of people who are on -- who are sanctioned for one of these reasons --**

A. Yes.

**Q. -- and then Wells Fargo --**

MS. RUBIN: Object to the form. Outside

the scope.
BY MR. CROCKETT:
**Q. -- simply checks a list?**
MS. RUBIN: Objection. Outside the scope.
Go ahead.
THE WITNESS: Yes.
BY MR. CROCKETT:
**Q. Okay. That's your understanding of how it works, correct?**
A. Yes.
**Q. Okay. All right. So if you go, if you would, to the next page, which is page 5 of the policy and procedure manual, toward the middle of the page, the bottom, it says "Wire transfer services prefers -- performs real-time OFAC screening using the Global Sanctions Management Operations System," which you call GSMOS. Okay.**
**We'll continue with this sentence, but let me first ask: Is wire transfer services your group?**
A. Yeah. It's my -- my department yes.
**Q. Okay. And you indicated there may be 40 people and three or four managers?**
A. There -- there's about 160 or 70 people



in the total department, but about 40 of them who report to me.
**Q. Okay. And tell me, if you would, the other 80 or so that don't report to you, just in general, what -- what are their -- what are their duties and job descriptions?**
A. Investigations, those are the folks who handle the recall requests and other types of inquiries on transactions; there's the customer support team, they accept wire transfers that are initiated over the telephone or questions about those wires that are initiated over the telephone; there's also a customer maintenance team, they maintain our database and set up customers on our -- on our database and maintain the database records; there's also a testing team, a team that would test changes to the system, make sure that they -- the system performs the way we expect it to; and -- and we also have a production support team, they bring up the system in the morning, monitor it during the day, bring it down in the evening, that kind of thing.
**Q. Some technology --**
A. Yeah.
**Q. -- people? Yeah.**



A. Right. Right. They kind of watch it to make sure that if something goes down, they spring into action.
**Q. The -- okay. So let me continue with this -- this wire transfer services, which is your area, "Performs OFAC screening on all domestic and international wires before the transaction is completed." Is that -- is that --**
A. Yes.
**Q. -- am I reading that correctly and understand? Okay.**
**And the -- the information that is screened against the OFAC list is all of these things, including the originator, the originating bank, you know, intermediary bank, beneficiary, recipient, and beneficiary bank. Okay. I understand all that.**
**What does "originator to beneficiary information" mean?**
A. That is the information that is provided by the originator for the beneficiary in order to help the beneficiary understand the -- the purpose of the -- of the transfer. How to apply the transfer.
**Q. Okay. I'm -- I'm just not sure -- could**



**you elaborate on that a little bit? I'm just not sure I follow you.**
A. It was -- it was the same thing we talked about earlier, that originator/beneficiary information. So the orig- -- the originator, when they initiate the wire, they would -- they want the beneficiary to know what the purpose of it was, what the -- what the --
**Q. I see.**
A. -- reason for it.
**Q. So if the person in the memo, if you will, you know, which is, how -- what I would -- it's -- it's a -- if the person happened to put, "Memo, give to so and so" --**
A. Yeah --
**Q. -- and that person were on the OFAC list, that would be triggered?**
A. Yes. Yes. Yes, that's a -- that's true.
**Q. As an example.**
A. If it said -- yeah. If it said the name of somebody was on the OFAC list, and it happened to be in the originator/beneficiary information, that would be enough for us to question it and perhaps be required to block it.
**Q. Okay. So let me now direct this line of**

**questions to Exhibit 3, the -- the wire detail summary that we talked about for quite a bit of time.**
**Is -- does all of that information on that -- on that summary on that Exhibit 3, are all of those fields part of the OFAC screening?**
A. No, because these are the fields of -- what's included here is a -- is a name that was not in the instructions that were received from Citibank. Okay. So what we're required to screen is everything in the payment of details that were received from the sending bank.
And in this case, as we know, the James Messenger was -- was listed as the intended beneficiary there. Chris Achebe turned out to be the -- the name that corresponded to the account number that was given for Messenger, but the -- the name Chris Achebe would not have been part of the sanction screening process because it was not provided by the sending bank. He was an account holder of Wells Fargo whose name wasn't mentioned in the -- in the details that were received, only his account number.
**Q. So if I'm understanding you correctly, if -- if Chris Achebe were actually on the OFAC,**



**you know, "bad guys list," nonetheless, the wire would -- would have been paid to him?**
A. We wouldn't have stopped it for sanction screening purposes, correct. Wouldn't have questioned it for sanction screening purposes.
**Q. Would there have been any other impediment to paying -- to paying Achebe if he were on the OFAC sanctions list, but not identified on the Citibank wire instructions?**
MS. RUBIN: Object to the form. Outside scope.
THE WITNESS: I'm not sure what you mean by impediment."
BY MR. CROCKETT:
**Q. Well, would he have been paid?**
**Was there any other --**
A. I can't think of any.
**Q. That's what I thought you were saying. I just --**
A. Okay.
**Q. I was --**
A. I just want to make sure I understood your question.
**Q. And I'm trying to understand you, of course.**



**Okay. All right. Now, you -- you had talked about that some of the OFAC screening was done by the system and some by people, some by individual employees that report to you; did I understand you correctly on that?**
A. Yes. So what --
**Q. What causes -- what causes the difference?**
A. The -- the system has an algorithm that analyzes the details of the transaction and determines how likely it is to be a true hit, a true match to someone on the -- on the list. So that algorithm scores the transaction, and if it scores above a certain threshold it requires an operator to -- to make -- to make the decision on whether it should be questioned or -- or released.
If it scores below that threshold, the system determines that it's -- it's not a true hit, and that the transaction can be released without any operator intervention.
**Q. Do you know what it was about this particular -- the wire instruction in this case that caused the -- there to be a quote "a hit" or a -- or a close to a true-hit score?**
A. Yes. It -- it --



**Q. Tell me what was that.**
A. -- it was the -- the word "attorney" was in -- in the instructions the E-Y was -- there was a space between the N and the E-Y, so that word -- that word that was formed by the partial word attorney, A-T-T-O-R-N, Attorn, if that's -- you know, not the word, but -- but the -- the partial name of attorney was a match to an entity on the OFAC list with the -- with the last name of Attoun, A-T-T-O-U-N, might have been first name Mohammad or Arabic first name, that was a close enough match that Attoun, A-T-T-O-U-N, and Attorn, A-T-T-O-R-N, the system deemed to be a close enough match to require an operator to make the call.
**Q. Okay. And then, presumably, the operator looked at it and said, "Oh, this is just an attorney."**
A. Yeah. It's a very obvious --
**Q. This is --**
A. -- it's a very obvious false hit.
**Q. Yeah. So -- so Riko -- if that was all that Riko Ong had in front of him, he wouldn't have lost much sleep over that call, right?**
A. It's very simple -- a very simple decision for him to make. And -- and honestly,

Page 82

that's the way most -- most of these are. It's -- they're almost all false hits. But in order to comply with the sanctions, you need to be 100 percent sure.

**Q. Okay. All right. I'm going to show you -- what's our next -- are we on 9?**

A. Yes, we're up to --

MS. RUBIN: Nine.

THE WITNESS: Yeah, 9.

BY MR. CROCKETT:

(PLF. EXH. 9, DOCUMENT BATES STAMPED WELLS FARGO SHAPIRO 508 - 512, was marked for identification.)

**Q. Okay. That's Exhibit 9.**

**Do you recognize Exhibit 9, which is a four-page compendium printout of 508 through 512.**

**I guess that's five pages, right?**

A. Yeah, I have five pages here.

And yes, I do recognize it.

**Q. And what is it?**

A. It's -- it's a record of the -- a transaction details of this particular wire that includes the information we saw earlier in Exhibit 3, I think it was, yeah; plus, the -- the information -- the transaction details that were

Page 83

provided in the incoming Fedwire from -- from Citibank; plus, what we call the audit trail of the transaction is referred to here as the message -- "Message History Sequence" that -- that shows the various steps in the -- that the transaction followed in -- in sequence as it was being processed.

**Q. Is all of this information taken from the contemporaneous MTS system at Wells Fargo?**

MS. RUBIN: Object to the extent that he testified about 508 previously in Exhibit 3.

THE WITNESS: So -- so this -- this transaction information is maintained in MTS for short period of time, and -- and it's also maintained in the AXCIS system for a much longer period of time. So AXCIS is the -- becomes the system of record and -- from which this -- this printout was made -- and MTS maintains that same detail but for about a month, and then eventually the transactions or the transaction history is dropped from MTS, but it's retained for at least seven years in AXCIS.

BY MR. CROCKETT:

**Q. Okay. Is this -- the information contained on Exhibit 9 also a business record of**

Page 84

**Wells Fargo maintained in the ordinary course of its business?**

A. Yes, sir.

**Q. And the information on -- on Exhibit 9 is accurate?**

A. Yes.

**Q. And contemporaneous -- it's -- it's placed on -- it's -- this record is created at or near the time of the events, in this case November 21st, right?**

A. Just -- just -- yes, at or near -- it's just after the transaction processing is completed for the day.

MS. RUBIN: And yeah, I can stipulate that this is part of the business records of Wells Fargo. I think that certain pages, as he's indicated, are different summons, exact time and others --

MR. CROCKETT: And we'll go over -- we'll go over the whole document. But I'm -- I'm attempting to establish that this is a business record --

MS. RUBIN: Right.

MR. CROCKETT: -- of the company.

MS. RUBIN: And we don't have a problem

Page 85

with that, I'm just not sure that this is one document --

MR. CROCKETT: Okay.

MS. RUBIN: -- like you've stapled it, that's all.

MR. CROCKETT: It's -- it's -- okay. And we'll -- this is an accurate, although computer generated, document maintained by Wells Fargo in its -- in its records, correct?

MS. RUBIN: We'll stipulate this was pulled off the system of Wells Fargo as part of its business records.

MR. CROCKETT: Okay.

BY MR. CROCKETT:

**Q. And similar to Exhibit 3, Wells Fargo will refer to this for any ordinary business purposes where it needs to know what happened with a -- with a wire transfer?**

A. Yes, sir.

**Q. Okay. All right. So I'm going to, again, ask you to explain this to me. We'll march through the five pages.**

**And as your counsel has indicated, some parts of it may be -- this may be two or three different documents that I've pieced together, you**

**know, so just please, you know, we'll get there.**
**The first -- the first indication's "wirecopy."**
MS. RUBIN: So just to make it simple, this -- 1 and 2 is 508, so I don't think you want to go over it again. It's the exact same thing, it's just in a different font it came in.
MR. CROCKETT: Okay. You mean Exhibit 3 and parts of it were also --
MS. RUBIN: Right.
THE WITNESS: Yes.
MR. CROCKETT: -- Exhibit 3?
THE WITNESS: Yeah. So right down to where you see those asterisks and "Message Text" --
BY MR. CROCKETT:
**Q. Yes.**
A. -- the information above that is what we saw in Exhibit 3.
**Q. Okay.**
A. And the only new information here is everything below "Message Text."
**Q. Okay. So -- so you -- you -- I won't ask you -- you saved yourself at least --**
MS. RUBIN: I just didn't want --
BY MR. CROCKETT:



**Q. -- at least 15 minutes; although, I probably would have caught on eventually, but we -- we -- okay.**
**So we understand that the part from "Message Envelope" to "Message Text" is the same as Exhibit 3 --**
A. That's correct.
**Q. -- so you've already addressed that.**
**Now, there is a title here "wirecopy 171121"; what does that mean, if you know?**
A. So that's the -- it means it's a copy of a wire with that transaction reference number, okay, and it's -- it's just the way that the -- the printout is created.
If you look at the -- just below that to the left you'll see that TRN 171121-162559, that is the -- that is the transaction number, it's a unique number that refers to that specific transaction. And it looks like this -- this copy was created in Notepad, hence the .txt extension on there.
So it's just the way that the -- that the screen prints were recreated in a document that could be printed out for purposes of this case.
**Q. Okay. All right. So let's go to the new**



**part of Exhibit 9 where it says "Message Text," what -- what does that mean on page 508?**
A. So what this basically means is this is the transaction data as it was received from the Federal Reserve Bank via the Fedwire system. So this is the data that came in to Wells Fargo from Citibank through the Fed.
**Q. Okay. And that's -- all right. And so the -- so the first one we see, we see "1100 Message Disposition"; what does -- what does that mean, if you know?**
A. I would say that's -- it's -- it's technical -- as a technical field that is not meaningful to the parties involved in the -- in the wire transfer, but it just shows that it's formatted version 30, which happens to be what's known as the new expanded format. It's not so new anymore.
It's -- if this were the test system it would say, test -- test production code would say "T" and not "P," but this is obviously a production system. And the message -- and the message status indicator "N" indicates an incoming message.
**Q. Okay. There's an acceptance time stamp November 21st, 16- -- 16:00 in -- 16:00 in what**



**time zone?**
A. That's military time in eastern -- eastern time zone.
**Q. Okay.**
A. 'Cause that's the Fed's record now. Okay. So the Fed's on eastern time.
**Q. So that -- that would be Washington, New York, and Miami; all of those?**
A. Yes, sir.
**Q. Okay. And Charlotte?**
A. Among others, yeah.
**Q. Okay. All right. Okay. So what would 4:00 mean in -- in -- in this case? What was received?**
**I'm asking because there's going to be earlier times.**
A. It came in -- it came in as the very first time that the payment arrived from Fedwire into the Wells Fargo system.
**Q. Okay. So that's when the payment went through as opposed to the instructions?**
A. No. The payment and the instructions are together, so --
**Q. Okay.**
A. -- it's when the -- when Wells Fargo's

Page 90

account with the Federal Reserve Bank was credited, and when the details of the transaction were transmitted --
**Q. I see.**
A. -- from the Fed to Wells Fargo.
**Q. Okay. So that's what I -- so -- so the -- the funds were credited to Wells Fargo at 4:00?**
A. Eastern time, yes.
**Q. Okay. I'm asking because there was going to be earlier times subsequent to this. So we'll -- we'll go over that.**
**Okay. So let's go to the second page. Continuing with the same information on the same transaction, "Output cycle date."**
A. Yeah. So these are -- these are all, again, more transaction data, technical data provided by the -- by the Fed that includes their cycle date, their destination ID, which I -- I don't recognize a lot of this information. I recognize it, but I don't -- I don't know what meaning it has to the Fed, but it's the Fed's --
**Q. Okay. This is --**
A. -- the Fed's data.
**Q. So the information on the top seven or**

Page 91

**eight infor- -- this is Fed generated and maintained --**
A. Fed technical data, yes.
**Q. -- maintained in Wells Fargo's system?**
A. They send it to us, so we maintain it, yes.
**Q. Okay. And then below that we see the "1510 type/subtype code"; what is "10 transfer of funds"?**
A. Yeah. So that's a -- that's an ordinary transfer of funds.
**Q. Okay. And then below that we find "Wells Fargo Bank N.A. full transaction report" for --**
A. Yes. So that -- that's --
**Q. Wait for the question.**
A. There I go again. Sorry.
**Q. -- for November 21, 2017; what does that mean, sir?**
A. So that is part of what was printed out here. Okay. It's not part of the transaction details. You see that page number there, so that indicates there's a -- there's a new page, and the -- and the way this was copied into Notepad, that's the title of the page.
**Q. So that's just a formatting?**

Page 92

A. Yes.
**Q. Okay. All right. And -- okay. So we then see below that "IMAD" with the code -- 1520 is -- what does that mean, if you know, the -- the 1520?**
A. Fifteen-twenty is -- is the -- the number of the field that contains the I -- the IMAD. The IMAD is the input message. Forget what the A and the D stand for, but it is the -- the IMAD is the unique reference number that the Fed assigns to each Fedwire transaction.
So if you want to distinguish one Fedwire transfer from another, the IMAD is the way -- is the way you do it.
**Q. Okay. And then the amount, we've seen that --**
A. Right.
**Q. -- 504,000 figure. Sending bank, Citibank by it's ABA number. Sender reference, this is Citibank reference number; am I right?**
A. Yes. Yeah, we talked about that earlier.
**Q. Okay. And receiving bank, Wells Fargo. I believe I read in your manual you use San Francisco no matter which -- which -- how many Wells Fargo branches there are, that's -- that's**

Page 93

**the reference number that's used; am I right?**
A. The reference address, yes.
**Q. Okay. Business function code CTP, customer transfer plus; what does that mean, sir?**
A. Well, it means that it's -- it's a transfer for a -- a non-financial institution beneficiary. So that's what a customer transfer as defined by Fedwire is as distinguished from a bank transfer, which would be a transfer that would -- the final beneficiary was a financial institution.
**Q. Okay. Charges?**
A. Yeah, if there were any it be reflected there.
**Q. Is that decided by Wells Fargo or by Fed -- the Fed?**
A. It's actually decided by the Fed.
**Q. Okay. Beneficiary's bank, there's numbers ending F/111900659 Wells Fargo; what does -- what does that mean, do you know?**
A. Yes, it's -- it's -- it -- it looks like it's -- it's an older ABA number of Wells Fargo.
We talked about this before.
And so that -- you see the ABA number up further, 121000248, that is the -- that is the only active ABA number now for -- for Wells Fargo. But

Page 94

banks tend to identify Wells Fargo by other ABA numbers, and that's what they did here. I believe that's a -- let me just...
Yeah, that's a nine digit number. So that's -- that's a -- most likely an ABA number. And I think I recognize it as being a predecessor ABA of the current Wells Fargo ABA, and it's -- it gets suppressed here because it's redundant information.
**Q. Okay. Now the next information beneficiary, what's the source of this information?**
A. This is the information as provided by Citibank through the Fed.
**Q. Okay. And this is -- so here we have the D with the Achebe checking account number, correct?**
A. Yes.
**Q. 0445 with Messenger's name?**
A. Yes.
**Q. And address in Syracuse, New York?**
A. Right.
**Q. So -- all right. And we have -- going to the next page -- originator with his -- or its checking account ending in 8856, Peter Shapiro P.A.?**
A. Correct.

Page 95

**Q. Okay. Originator's bank would be Citibank identified.**
**Instructing bank, Citibank N.A. Retail Wire Settlement, same bank; am I right?**
A. Yes. This is information, again, provided by Citibank that we retain, and that's what's in field 5200, yes.
**Q. And originator to beneficiary information, this is -- in this case it's -- it's tel with a 315 area code, 47- -- 471 --**
A. Yes.
**Q. -- 3030.**
**And beneficiary information, what's the source of -- of that?**
A. Again, that's information provided by -- that we receive -- that Wells Fargo received from the Fed and originated by Citibank.
**Q. Okay. And this is where you see "Attorn"?**
A. That is where "Attorn," yes. That's the -- you see the carriage return there that created a space after N and before E-Y that caused them to -- potential match to the entity on the sanctions list.
**Q. Okay. And then if we come here, what I guess was before this, it was formatted in this particular document, this is -- continues with the Wells Fargo Bank Full Transaction Report for this particular transaction; am I right?**

Page 96

A. Yes.
**Q. Okay. "Remittance Data Unavailable"; what does that mean?**
A. If there were remittance data, it would have been -- it would have been included here and reflected here.
But the -- the Fed allows for remittance data to be included in a transaction. It's usually relevant to commercial transactions, not to retail transactions. So remittance data would be invoice number --
**Q. I see. Okay. So not applicable here.**
A. Yeah, the terms of the sale, that kind of thing.
**Q. Okay. The next thing -- the next thing we see continue -- appears to continue for three pages called "Message History Sequence"; am I -- am I right, the next --**
A. Yeah. So that's --
**Q. What does that mean?**
A. -- basically the rest of the -- so this is what -- what I refer to as the audit trail. Reflected here is the "Message History Sequence," but it's all the various steps and time stamps along the way that the -- that reflect the life of the transaction for as long as it -- from the time it came in, all the various steps that it took as it was being processed, and eventually completed processing.

Page 97

**Q. Now, are these all the steps that occur within the Wells Fargo MTS system?**
A. Yes. These -- and these are all Wells Fargo transaction details in that they -- this picks up when the transaction was received by Wells Fargo, and follows it along to when the tran- -- it was completed processing.
**Q. Okay. Now, let me start with the -- at the top: 121 is the owning bank -- 121, I think you said, is Wells Fargo; am I right?**
A. Right. Well, there's -- there's only one bank. There used to be multiple banks on the system, but now 121 is Wells Fargo, and it's the only bank that's -- that's valid now in the system.
**Q. Now, the first -- the first line under the "Message History" is a reference number, which I believe is the same transaction number that we**

**see on the first page, right; let's see, 17121-62559?**
A. Yes.
**Q. Okay. And there's a time -- there's a date, November 21, 2017, and there's a time of, as I read it, 3:00 and 20 seconds; am I -- am I reading that correctly?**
A. It's -- it's exactly 3:00, and I think that's 20/10th -- you know, fraction of a second there. So it's -- it's 3:00 central time --
**Q. Central time?**
A. Right. Right. So --
**Q. Okay. That was my question.**
A. Four -- 4:00 eastern time, right.
MS. RUBIN: I was going to tell you earlier, but I figured I'd let him get to it.
THE WITNESS: And so -- and so if it was 3:01 you'd see 15:01 there or -- so it says 15:00, so it's exactly -- well, it's not exactly, it's -- it's 15- -- it's -- it's 3:00 and then --
BY MR. CROCKETT:
**Q. Twenty seconds.**
A. Twenty/tenths of a second and --
MS. RUBIN: I think it's 20 seconds.
BY MR. CROCKETT:



**Q. Is there a period before that?**
A. Yeah.
**Q. I think it's 20 --**
MS. RUBIN: Point 07.
BY MR. CROCKETT:
**Q. -- and then 6/100s of a second, right? But regardless, we can --**
MS. RUBIN: There. There. There. I'm looking --
THE WITNESS: Yeah, so if you look -- yeah, it's -- it's fractions of seconds there past the second colon.
BY MR. CROCKETT:
**Q. Okay. Is it 3:00 p.m. because the account in this case was in Texas or --**
A. No --
**Q. -- for some other reason?**
A. -- it's 3:00 p.m. because that's the -- that's the way Wells Fargo's MTS system runs on central time. That's the way we reflect our records of the -- of the -- of the processing time.
The Fed happens to run their system on eastern time. So what they sent in eastern time gets recorded by Wells Fargo in central time. Always going to be an hour difference.



**Q. Okay. So there's no way we would have ever known that without -- without you explaining it.**
**Okay. All right. So -- so let's continue. The -- the next line we have "FEDMQIN1" with a number; what does that line mean, if you know?**
A. Right. So that -- that means we -- we took it in through the Fed line. So there's a telecommunication line that connects the Fed -- the Fed's computer with the Wells Fargo's computer system, and it came in through that -- that Fed in line.
**Q. Okay.**
A. And -- and of course, we keep track of the sequence of transactions that come in. So every transaction -- you know, if we receive 18722, the next one should be 18723, et cetera. So if you ever have a gap, you know you have a problem.
**Q. What is the significance of the next line starting 12100248?**
A. That's -- that's Wells Fargo's ABA number. That's the ABA number to which the -- the incoming Fedwire was sent and received.
**Q. So this is Wells Fargo's sequence number?**



A. No. It's their ABA number, which is the routing number with --
**Q. No, that -- but I meant on -- going over to the right, the sequence number 1719.**
MS. RUBIN: Where are you?
MR. CROCKETT: Just -- just below that, the FEDIN1, there's a difference sequence number.
THE WITNESS: Yes. Yes. So that's a sequence number that Wells Fargo assigns as -- in the -- in the order that the transactions were received.
BY MR. CROCKETT:
**Q. Okay. And I think you had mentioned the -- there's a Fed reference number in there, individual IMAD number?**
A. Yeah. You can see it down there, the IMAD is further down, it's a big long number that begins with the date --
**Q. Okay.**
A. -- and ends with FT03. That, again, is the unique reference number that the Fed assigns to -- to each Fedwire transfer that is sent. So -- so you'll always be able to uniquely identify a Fedwire transfer using that number.
**Q. Okay. "FEDINQ" and with the letters DEQ;**

**do you know what that means?**
A. Right. DQ means it -- it -- it came in through that queue and left that queue, and came in and was logged in the FEDIN log, which is where the transaction then gets mapped or routed into the MTS Wells Fargo wire system.
**Q. So that -- so this -- the instructions with all of the information that we've had before, that is, you know, Exhibit 3, was in Wells Fargo's system as of 3:00 at 34 seconds?**
MS. RUBIN: Object to the form.
I don't even really understand the question, but...
MR. CROCKETT: Well --
MS. RUBIN: I believe it's a different document.
BY MR. CROCKETT:
**Q. No, I -- I -- well, the question is that the -- was the information that we see in the first page of Exhibit 9, which we've also talked about in Exhibit 3, was all that information on the MTS system as of 3:00 p.m. on the date of this wire?**
A. No, it -- it -- because it's not completed processing yet. It doesn't complete processing until --



**Q. Okay.**
A. -- 15:29, so at that time it is, but not -- not at 3:00 p.m.
**Q. Okay. The next -- what -- what is -- what -- if you can tell me, you may not be able to tell me this, do you know what information was on the Wells Fargo MTS system as of the in-log time of 15 minutes -- 15 -- I guess let's say 3:00 p.m. and 34 seconds?**
A. No. It has -- it's just that's when it entered the system, so none of that information has been mapped. That's what's happening as this tran- -- as this audit trail continues. Those are the various steps --
**Q. Okay.**
A. -- that are mapping that information into the appropriate fields.
**Q. Do you know what is meant by "ABA Index" and the "Key 02100089"?**
A. Yeah, that's the -- that's the ABA of the sending banks. So we want to make sure that we have that in our files so that we correctly identify the sending bank to -- to our customer when we credit their account.
**Q. Okay. What is a "SYS MEMO," sir, within**



**the Wells Fargo records?**
A. It's an automated -- it's an automated recording of what the system did when processing the transaction.
In this case, it means that the -- the BBK was removed. Remember up in field 4100 we had that old routing number, and that old routing number, that would have been redundant to include there 111900659 was -- was -- was removed, and this just reflects that it was removed and replaced with the beneficiary party in the payment detailed routine.
**Q. Okay. So that's -- that's eliminating the beneficiary's bank information that was the old ABA number 11190659?**
A. Right, which is -- which would have been redundant to include there because it also identifies Wells Fargo.
**Q. Okay. Now the next, system memo can you tell me what that involved?**
A. Sure. So Autotrieve is the -- is the interface that we have between MTS and HOGAN. The HOGAN is the Wells Fargo DDA system. And so that's where the account number provided by the sending bank, Citibank in this case, is -- is sent out to



HOGAN to see if there's a match there.
**Q. Okay. And so is that where the information that -- that we see on the first page of Exhibit 9 relating to Chris Achebe's --**
A. Yes.
**Q. -- payment address, that's when that came in?**
A. So you can see that before the call it was sent as D 7414400445, and then after the call it was zero filled on the left. We have -- the system zero fills those -- the left side of the transaction so that they're all 15 -- in the end they're all 15 digit numbers that the system is expecting.
**Q. Okay. And the -- I guess it's the fifth system memo it says "Autotrieve VLD V name and address"; what does that mean?**
A. It just means that it pulled the -- the name and address from HOGAN that matches that account number.
**Q. Is VLD, is that -- is that short for --**
A. Validated.
**Q. Valid...**
**And do you know what the second V is?**
A. I do not.

**Q. Okay.**
MS. RUBIN: Oh, down there.
BY MR. CROCKETT:
**Q. Okay. The -- and there's -- the -- the next system memo says "3D," a variety of numbers "N," can you tell me what that -- what that means? This is the third system memo from the bottom on page 510.**
A. "JD0068431 N" --
**Q. Yes.**
A. -- that?
**Q. Correct.**
**Can you shed me light on what that is?**
A. I -- I can -- I cannot at this moment. I can find out for you. I don't -- I don't -- I don't recognize that as meaningful information for --
**Q. Okay.**
A. -- for me, anyway.
**Q. All right. And the next systems memo says, "Possible name match in CDT party." Is that a recognition that the name of the beneficiary identified on the wire instructions is different from the name of the account holder as determined by -- from HOGAN by the MTS system?**



A. It's -- it's a system memo that indicates that -- that there -- there's possibly a difference, right.
**Q. Now what -- what time was that system memo generated at Wells Fargo?**
A. Just fractions of a second after it was received. So it's still -- it's still 3:00, 1500 hours, but this is at 34th/35, so it's not even, you know, a second after.
**Q. Within immediate -- very close to 3:00 p.m.?**
A. Yeah.
MR. CROCKETT: Okay. I think we need to take change the tape.
VIDEOGRAPHER: This is the end of Video I.
We're going off the record at 2:17 p.m.
(A recess transpired.)
VIDEOGRAPHER: This is Video II of the video deposition of James Ansbro.
We're going back on the -- as 30(b)(6) witness for Wells Fargo, N.A.
We're going back on the record at 2:26 p.m.
BY MR. CROCKETT:



**Q. Okay, sir. So following up on this system memo that says "possible name mismatch in CDT party," would you agree that the Wells Fargo system noticed what we talked about on the first page of Exhibit 9, that the -- there was a difference between the party to be credited at Wells Fargo from the party identified as the beneficiary on Citibank?**
A. The system memo does reflect that, yes.
**Q. Would you agree that the system created a warning --**
MS. RUBIN: Object to the form.
BY MR. CROCKETT:
**Q. -- of a mismatch?**
A. No, I wouldn't call it a "warning," because it's -- it's not seen by anybody. It's -- it's something that the system creates, but since there's no operator involved in the processing of the transaction I wouldn't call it a warning.
**Q. So the purpose of -- of checking this -- this system is checks for a mismatch, but you're telling me once it finds it, it's ignored?**
A. I'm -- the -- the system looks for a valid account number. If the system finds a valid account number, then that's the account number that



ends up being credited, and the system alert memo reflects that that account number may not be an exact match to the -- to the name provided.
**Q. After the system notice the mismatch, was it the information simply ignored?**
A. The system is --
MS. RUBIN: Object to the form.
THE WITNESS: -- it's -- it's recorded in the audit trail of -- of -- of the transaction, but there's no operator to ignore it. There's -- it's just reflected in the audit trail of the transaction.
And the -- and the system continues to process the transaction without anyone being aware or having knowledge of the -- of the memo that was created.
BY MR. CROCKETT:
**Q. So it is Wells Fargo's policy and procedure when its system immediately notices a mismatch between the credit party and the beneficiary party, that information is not given to any individual for follow up?**
A. The way I would put it is that when the -- when there's a match to a valid account number, that's all that matters to the system:

Page 110

That the account number is valid, it matches a credit party, and that's what the system in a fully automated way decides is -- becomes the credit party for the transaction.

**Q. So who, if anyone, at Wells Fargo learns of the system memo that says there's a mismatch between the CDT party and the beneficiary party?**

A. No one.

**Q. And that's Wells Fargo's policy, that this -- that a memo of this nature simply goes nowhere?**

A. Yeah.

MS. RUBIN: Object to the form.

THE WITNESS: Well, it's -- it's -- there's no operator to read it, so it's recorded, it's reflected in the history of the transaction. And decades ago it -- it -- it may have been meaningful before the transactions like this were processed in a fully automated way.

But transactions like this with valid account numbers are now processed in a fully automated way so that the memo is still recorded there, but there's -- there's no -- there's no action taken as a result of it.

BY MR. CROCKETT:

Page 111

**Q. Wells Fargo, if it wished, could program this information to go to Citibank in a fully automatic way, correct?**

MS. RUBIN: Object to the form of that question. Calls for speculation too. Outside the scope --

THE WITNESS: I'm not sure what you mean. This is -- this is Wells -- this is Wells Fargo receiving from Citibank, it's not like the way you --

MS. RUBIN: Form.

BY MR. CROCKETT:

**Q. Well, as I understand you, nothing happens with this information, correct?**

A. Correct.

**Q. Nothing is done with this information.**

**Wells Fargo, if it wished, could forward this information to its repair division, for instance; that doesn't happen, correct?**

MS. RUBIN: Well, let me just object to the extent that it's outside the scope.

If you're asking him for IP -- IT department issue, then he wouldn't be the individual to testify about that.

BY MR. CROCKETT:

Page 112

**Q. Well, you can answer the question, I think.**

A. So what I would say is is there's no reason for us to require the transaction to be repaired because the -- the account number provided is -- is valid.

And what we're trying to do is process transaction as highly automated way as -- as possible in order to avoid the risk associated with operator intervention.

**Q. Okay. And you -- even though it was -- even though the processing was automated, Wells Fargo could automatically say, "Anytime there is a mismatch between the CDT party and the BNF party, we will not go forward with the transaction, but send it back to Citibank"; that -- that hasn't been done either, correct?**

A. It has not been done. And, you know, for us, there'd be no reason to.

But hypothetically, what that would do is -- is it would severely reduce the level of automation associated with processing transactions like this.

**Q. Well, is -- is -- is automated -- is automating the goal or getting the money to the right person the goal?**

Page 113

A. Well, both. They're -- they're --

MS. RUBIN: Let me just object to the extent that that calls in the Federal government, and the Federal government regulations requirements of -- of moving money through the system. Subject to that...

Go ahead, if you want to answer.

THE WITNESS: Well, I -- I would just say that in -- in this account agreement, I -- I haven't seen it.

BY MR. CROCKETT:

**Q. What -- what's -- what's the number, sir?**

A. This is Exhibit 6.

And I believe if we went through here we would see there's a wire transfer section in here that -- that -- that indicates that a -- when a name and a number are provided, that the -- the number would take precedence.

I'm not an expert on this document, but...

**Q. I'm not -- I'm not sure that's in there. I'm sure that is in certain places, but --**

MS. RUBIN: I don't know.

BY MR. CROCKETT:

Page 114

**Q. But anyway, let me -- let me leave -- leave that.**
**You -- so you have said, I think, that nothing happens with this information, does that mean that even in a case where there's an actual screen or who looks at the transaction, which in this case you said was Riko Ong, that information is withheld from Riko Ong?**
A. No. No. So we're talking about two different screening processes. Okay. One is a -- is a repair. During a repair process an operator may have the opportunity to notice that there's a mismatch between the name and the number.
But what Riko performed was a sanction screening process, which -- you know, we can talk about detail some more if you'd like, but that doesn't involve comparing a name and number, it just involves comparing the transaction details on the -- on the sanctions list to the details in the transaction.
**Q. Well, it -- it involves what -- whatever is -- information is made available to the reviewer. So my --**
A. Okay.
**Q. -- this is just a factual question --**

Page 115

MS. RUBIN: No. No. No. Wait a minute.
BY MR. CROCKETT:
**Q. -- is -- is --**
MS. RUBIN: Let me just object to the testimony of Mr. Crockett and ask that it be stricken. That's not an appropriate question.
MR. CROCKETT: Motion overruled.
MS. RUBIN: Go ahead. Go ahead.
BY MR. CROCKETT:
**Q. Okay. The -- the -- this is a -- this is a factual question: The -- does the system memo -- or is the system memo that there is a possible name mis- -- mismatch, is that communicated to the OFAC sanctions reviewer?**
A. No. No. So the sanction screener is working in a different system. So what we'll see here a little bit further down in the audit trail is the transaction exits the MTS system through an interface, an electronic interface, goes to the GSMOS system where the sanction screening takes place, then comes back to MTS.
Where Riko the sanction screener was working was in the -- in the -- in the other system.
**Q. Does -- does the reviewer, such as Riko**

Page 116

**Ong in this case, have access to the MTS system should they wish to access it?**
A. No, he does not. He -- he only has access to GSMOS.
**Q. Okay. So -- so -- so far from communicating this -- this information to the OFAC reviewer, Wells Fargo actually prevents them from learning this information?**
A. In this particular case. There are some operators --
MS. RUBIN: Object to the form.
Go ahead.
THE WITNESS: -- some operators have access to both systems. Riko's not one of them.
BY MR. CROCKETT:
**Q. Okay. But would you not agree that for purposes of OFAC sanctions, the person who actually is going to get the money is a material fact?**
**Don't you think the government wants you to determine whether the actual recipient of the money is on the OFAC list?**
A. Yes. And if he's an account holder of Wells Fargo, he's screened against that list at the time the account is open, and periodically after that as well.

Page 117

**Q. Okay. So explain that to me.**
A. So if -- if Jane Doe opens an account with Wells Fargo, part of the due diligence involved in opening that account would be to make sure there are no sanctions, OFAC or otherwise, against Jane Doe --
**Q. I see.**
A. -- when the account is opened.
**Q. Okay. So at a different -- at a different time?**
A. Yes.
**Q. Okay. Okay. But, of course, if sanctions have been added --**
A. Yeah.
**Q. -- at a later time, that would not be caught in -- in -- because under your system Wells Fargo ignores who the actual beneficiary is?**
A. Yeah, I'm not the expert on that, so I don't want to --
MS. RUBIN: I was going to say, that's outside the scope of when OFAC looks at customers.
THE WITNESS: For purposes of wire transfer compliance with the OFAC sanctions, we -- we scan all of the details provided by the bank that sent the transaction to us.

Page 118

BY MR. CROCKETT:
**Q. No, I understand your procedures.**
A. Yeah.
**Q. Okay. Let me -- I think I do --**
MS. RUBIN: Well, it's a requirement of the Federal government.
BY MR. CROCKETT:
**Q. Let me -- let me go back to where we were on Exhibit 9. We had left off with possible name mismatch, and there's another system memo under that starting with "CVD 7, DVD 6," et cetera; can you interpret that for me?**
A. I'm sure I can. Just let me find it.
**Q. It's the very last -- very bottom of page 510.**
MS. RUBIN: No, it's right here.
THE WITNESS: Yeah. No, I saw it. I'm just trying --
MS. RUBIN: I see.
THE WITNESS: -- to get context of it.
I thought I'd be able to figure out what that is, but I cannot. So I can get that information for you, but it's not -- it's a bit too technical for me to know offhand.
MR. CROCKETT: Okay. And I would --

Page 119

probably it's the most -- my suggestion, Counsel, is the most expeditious, the couple that he couldn't identify, if you could just, you know, send me a letter or something, we could... They probably would not be material enough.
THE WITNESS: I doubt it.
MR. CROCKETT: But I can't say since it is right after the name mismatch.
MS. RUBIN: Right. No, I see it.
BY MR. CROCKETT:
**Q. Okay. All right. So -- so let me go to the -- we're now on page 511 -- the next page of this same audit trail, if you would. There's another system memo, "Stop check. Message routed to external sop -- stop server"; what does that mean, sir?**
A. So that means that the -- that the system's going to check to make sure it's a valid GL number that we're -- that we're about to debit here, and that's what -- that's what that server determined, to validate it.
**Q. So this is referring to the Citibank GL number?**
A. Well, it's not the Citibank GL number, but it's -- it's the GL number used for the

Page 120

Citibank transaction, because any incoming Fedwire would use the same GL number.
**Q. Okay. So what does "external stop server" mean, if you know?**
A. Yeah, I don't know the -- why it's referred to that way, but --
**Q. Okay.**
A. -- it's -- it's the memo that's generated at the time the -- the message -- the payment is being routed to validate the GL number.
**Q. Okay. The next we -- we find fractions of a second later there's another system memo "MRSTOP, MR MAP"; do you know what that means?**
A. It's -- it's still part of the GL validation step there.
**Q. Okay. And GL would be the -- the Fedwire, general ledger?**
A. General ledger, yes.
**Q. And this is an account that Wells Fargo has --**
A. Yes.
**Q. -- which Fedwire --**
A. Yes.
**Q. -- puts money into?**
A. It's -- it's -- it's the account that's

Page 121

credited upon receipt of a Fedwire transaction.
**Q. And that's -- there's another reference to the general ledger, and then "NOF ACC NDX," what is -- can you tell -- tell me what that means?**
A. Yeah. NOF is non-on-file, which means that the -- that the account number credited was not one that's on -- on file with the -- on the MTS database.
So most retail customers' accounts would not be on MTS database because they don't normally receive wire transfers. That's why we had to go out to HOGAN to -- to validate it.
**Q. Okay. And then, again, we see the Achebe account number with "key" in front of it, is -- is that -- does that mean that's the account number --**
A. Yeah, that's the --
**Q. -- where the money was going to go?**
A. Yes. Exactly.
**Q. Okay. And "Memo CDT"?**
A. Credit, yes.
**Q. Okay. So the money was -- was going to go, but hadn't been paid yet, correct, 'cause it hadn't been screened?**
A. It's not completed -- it's not completed processing yet, yeah.

Page 122

**Q. Okay. And then next we see "ADR MSG QUE"; what does -- what does that mean, if you know?**
A. That's just another queue that -- that the transaction flows through on its way to completion. The next step of which is the sanction screening process.
**Q. Okay. "Begin destination DST 1"; do you know what that means?**
A. Yeah. So it's about to deliver the -- the -- the message to the sanction screening application, GSMOS in this case.
**Q. Okay. Now, there's -- I see reference to GSMOS, you know, further down, but there appears to be another destination "ENQ" with three, four entries, and then --**
A. Yeah, so that's the OFC out queue. OFC is -- indicates to me that it's an OFAC queue. So we have multiple lines that go out to GSMOS. They're all OFAC.
This one happens to be the fourth one. There's five total. So OFAC4 went out through the fourth -- five lines that go out to GSMOS in order to be -- for the sanction screening process to be performed there.

Page 123

**Q. Okay. And we have -- so there's -- we see "OFAC4 SRF" with the "key"; do you know what -- what that -- what that means in Wells Fargo's system?**
A. I don't know what the key -- the key -- what the significance of the key number is, but OFAC4 is -- is the -- is the line that sent out the transaction to GSMOS.
**Q. Okay. And the -- the OFAC screening in this case appeared to happen -- well, there's -- there's an entry at -- at 3:00, 15 -- 15 hours, and then there's another entry at 15:29, 3:29 --**
A. Right.
**Q. -- some half hour later. Was --**
A. Right.
**Q. Can you tell me where that -- in that range of time did the actual OFAC screening occur?**
A. Yes. And -- and just give me an opportunity to correct the -- the way the times are reflected here too, because what this -- that 15:00:35.88 is -- there are -- there are hours, minutes, seconds, and then fractions of seconds there, right.
So that means at the OFC outline at 35 seconds after 3:00 -- 35.88 seconds after 3:00 to

Page 124

be exact, and -- and then it stayed there, it stayed in the GSMOS application until it came back at 15:29:23.23. So it stayed in there for 29 minutes, approximately, it took for the transaction to go out to GSMOS, get work there, and then upon completion of the sanction screening process come back into MTS from GSMOS, that took 29 minutes.
**Q. Okay. And can you tell at what point in time the wire transfer was accepted, if you will, by Riko Ong?**
A. I can't tell -- from this, I can't tell exactly that, but I can tell that after he accepted it it routed back into MTS at 15:29:23.23.
**Q. Okay. Is -- is the procedure that the screeners send it back to MTS when they accept it or?**
A. They clear it, and then the system sends it back --
**Q. Okay.**
A. -- so their -- their -- their job is to clear it, and then the system -- the automation between the two systems takes -- takes care of routing it back.
**Q. Okay. And at this -- so at 15:29, that is 3:29 in the afternoon central time, the -- there**

Page 125

**was a system memo that O- -- OFAC screening was passed?**
A. That's correct.
**Q. Okay. And where in this -- which of these many abbreviations indicates that there was -- the GSMOS had brought up an actual person into the screening process?**
A. Well, the -- the "Pend IOFAC Pending OPS" system memo, that indicates that the transaction has been routed to GSMOS and is pending there for -- that's called the OPS, the OPS queue.
I think I mentioned earlier that if the transaction scores high enough over threshold, it requires an operator from my team to look at it. If it scores over an even higher threshold, it goes directly to our global sanctions office to be -- to be decisioned; and then, in which case, there'd be a different system memo on here.
But this one says "Pending OPS" because it scored in-between those two thresholds, so that it was required for my operator, the operations operator, to make the decision on it.
**Q. Okay. And then am I right on 15:29 minutes and 23 seconds, the wire is -- is -- is accepted?**

Page 126

A. It --
MS. RUBIN: Object to the form.
BY MR. CROCKETT:
**Q. Is that what --**
MS. RUBIN: Accepted.
BY MR. CROCKETT:
**Q. -- "dollar dollar dollar pay" means?**
MS. RUBIN: Where is that?
THE WITNESS: It -- what it means is --
BY MR. CROCKETT:
**Q. Pay --**
A. -- what it means is the transaction --
**Q. -- pay and**
A. -- has returned from -- it was rerouted back to MTS from GSMOS, and determined to be a false-positive in GSMOS.
**Q. Okay. And what does PAYADV -- "P-A-Y, A-D-V - LOG"?**
A. That -- that -- so that -- that's the pay advice log is -- is the -- that's the log that is going to allow the posting of the -- of the -- of the transaction, which is the next step in this process here for --
**Q. Okay. What is "OPRID"?**
A. If there were an operator ID. So

Page 127

there -- there would be -- if there were an operator involved in the processing of this transaction at this point, it would have their ID number there.
But that "dollar dollar dollar pay" is just the -- the default that is put in the operator ID field when it's a totally automated process.
**Q. Okay. And so 15:29 and 23 seconds is what, what occurred at that -- at that minute?**
A. The transaction routed back to MTS from GSMOS.
**Q. Okay. And at that point, the -- the wire has been paid or is there another subsequent time when the money --**
A. So it's --
**Q. -- is credited to the account?**
A. -- almost done processing now, but it's been cleared through the sanction screening process and it's about to be posted, what we call memo posted to the account.
So a memo post will increase the balance in the account by the amount of the wire in a real-time, sort of intraday basis, and then a hard posting takes place overnight so that when the new balance in -- in the account is created for the

Page 128

opening of business the next day, it reflects that credit.
**Q. Okay. And the -- the -- the soft posting to the account -- crediting to the account happens at 15:29 or some other time?**
A. Yeah, it happened at 15:29.
**Q. All right. And do you see any other times on this other than 15:29 --**
A. No --
**Q. -- and 24 seconds?**
A. -- what this basically is is the completion of the -- of the processing of the transaction that's taking place all the fractions of a second after 15:29.
(PLF. EXH. 10, DOCUMENT BATES STAMPED WELLS FARGO SHAPIRO 513 - 515, was marked for identification.)
**Q. Okay. All right. I'm going to show you our next exhibit, which is Number 10.**
MS. RUBIN: How come yours is easier to read than mine? Mine was so light, I couldn't even read it.
MR. CROCKETT: Maybe we darkened it, I don't know.
MS. RUBIN: Maybe.

Page 129

BY MR. CROCKETT:
**Q. Okay. Do you recognize this three-page document entitled "GSMOS On-line Inquiry Results"?**
A. I do.
**Q. Okay. And tell me what -- what is it, sir?**
A. It's the transactions details that were screened for sanctions compliance purposes.
**Q. Okay. So is Exhibit 10 -- I believe you -- you signed an interrogatory which said, "This is the sum total of the information that was before Riko Ong and his review of the -- of the particular transaction"; do I have that right?**
A. Yes, sir.
**Q. Okay. And you -- and you told me what this has, for our purposes, is the account number and then the beneficiary name "Messenger" from the wire instructions, not the actual account holder, correct?**
A. That's correct.
**Q. And -- and we see that on this document?**
A. Yes.
**Q. So -- so nowhere on this document does the name Chr- -- or address of Chris Achebe appear, correct?**

A. That's correct.
**Q. And you said that information was not known to Riko Ong under the procedures of Wells Fargo; am I right?**
A. That's correct.
**Q. Okay. Now, the only thing we haven't discussed is the third page. If we look at the -- the entity that was the possible false -- false-positive, we have a Ahmad Attoun of -- of Hamas?**
MS. RUBIN: How do you know that?
MR. CROCKETT: Do you see -- I'm just reading from the document.
THE WITNESS: Yes, so it's part -- it's -- that's a description of -- of the particular sanctions that are -- that he's -- that this entity is involved with rather.
BY MR. CROCKETT:
**Q. And the -- assuming that's a -- that's a one person, I'm not 100 percent sure, but if it's one person, that was the -- that was the false-positive that -- that you've addressed?**
A. Right. It's a very obvious false-positive as a result of the -- the match between the first six letters of attorney.



**Q. Now, if we look at the very last line, it -- it gives a time of 4:28; which, again, I believe using GSMOS is an eastern time?**
A. Yes, it is. It is. Just to confuse things. Sorry about that.
**Q. So --**
A. Yes.
**Q. -- but --**
A. So not all -- all Wells Fargo systems are on the same time. GSMOS happens to be a -- a -- run in a data center on the east coast, so it's on -- it's on eastern time. So that 14- -- that 4:28 corresponds to the 3:29 that --
**Q. Right.**
A. -- central time when the transaction completed processing here and came back to --
**Q. So this --**
A. -- MTS.
**Q. -- this screener said "okay" a minute before the system --**
A. Yeah. It took about a minute --
**Q. -- processed it?**
A. -- for it to flow back to -- to the other system, yeah.
**Q. Okay.**



A. It took him probably 28 minutes to stay in the queue there in order -- till he got to that depth in the queue to work on it.
**Q. How -- I understand this is an estimate -- what would be the normal time a screener would -- would look at these -- this information?**
A. It would take less than a minute to work on this, maybe -- maybe --
**Q. A few seconds?**
A. -- less than 30 seconds, yeah. One that's as obviously a mismatch as this.
**Q. And the procedures are if there's a question it could be kicked upstairs to somebody else?**
A. Yeah. So kicked upstairs. I -- I would call it "escalated," that's what we do in -- in -- in GSMOS, which basically means this is too close a call for me, I'm not comfortable saying this is a false-positive, I'm going to escalate it to our global sanctions office where they will make the final call.
**Q. Okay. So that's not you, that's another -- another person?**
A. It doesn't report to me, no. No, it's



part of our compliance area.
(PLF. EXH. 11, DOCUMENT BATES STAMPED WELLS FARGO SHAPIRO 543 - 659, was marked for identification.)
**Q. Okay. All right. I'm going to show you what we will mark as Exhibit 11.**
**Do you recognize this document, which appears to be the wire exception policies of Wells Fargo as in effect on the date pertinent to this case, November 21st?**
A. Yes, I recognize it. I would call it a "procedure document." It's the procedures that we follow when a wire transfer has to be repaired.
**Q. And this is an accurate description of Wells Fargo's accurate procedures as of November 2017?**
A. Yes, sir.
**Q. And this is a document you use in the ordinary course of your work --**
A. Yes, sir.
**Q. -- at Wells Fargo.**
**Okay. And is this given to the individuals who report to you?**
A. They have access to it.
**Q. Is this an on-line document?**

Page 134

A. Yes, it's available on-line. They have access to it, you know, if they need to refer to it, but --
**Q. Okay. So this is a printout, but if I'm working at Wells Fargo, I could hit a hyperlink in the table of contents and it would go to the --**
A. That's fair, yes.
**Q. -- department page?**
**Okay. All right. I have some questions about it. If -- if you go to page 10 of the Wire Exceptions Procedure manual, which is Bates stamped 552.**
A. Okay.
**Q. Okay. "Wire Transfer Services - Wire Exceptions"; you see that?**
A. Uh-huh.
**Q. You need to answer with a word, sir.**
A. Yes.
MS. RUBIN: Answer yes or no.
BY MR. CROCKETT:
**Q. All right. "The -- the primary function of the exception operator is to identify the party to be paid."**
**Who is the -- what is the exception operator?**

Page 135

A. So the exceptions team operator is the operator that repairs the transaction.
**Q. Okay. So this is one of the folks who repairs -- who re- -- reports to you?**
A. Yes.
**Q. Okay. And the -- "Typically, the party is identified in the original SWF wire message text"; what is -- what is --**
A. So SWF is a SWIFT message. The SWIFT is a messaging standard that global banks use to communicate with each other. Payment auditors, administrative messages.
**Q. Was that used in this case?**
A. No.
**Q. Is there any difference between the SWIFT message or the Fedwire message?**
A. Yeah, big difference. Fedwire's a payment system. SWIFT is a communication system. Fedwire transfers money. SWIFT instructs or can instruct the money to be transferred.
But SWIFT is not relevant to the processing of the transaction we've been discussing here.
**Q. Is -- is SWIFT what Citibank used to -- between it and the Federal Reserve?**

Page 136

A. No. No. So it's -- again, SWIFT is a messaging system. Not -- not that I know --
**Q. Not a payment system at all?**
A. Right.
**Q. Okay.**
A. Not -- not that I know what's -- what Citibank used, but I -- I wouldn't think that it would be involved in a -- a domestic transfer such as this one.
**Q. Okay. So as -- as I -- we read on, this -- this states that, "The exception operator has access to HOGAN in order to obtain information needed to repair the incoming wire" --**
A. Right.
**Q. -- is that -- is that correct?**
A. Right. Right.
**Q. So -- so your people in the wire transfer services area do have the ability to access HOGAN, although Riko Ong does not; am I -- do I understand that correctly?**
A. No. Riko --
MS. RUBIN: Let me object to the form.
I think you're confusing systems too, based on his prior testimony.
THE WITNESS: So Riko -- what you asked me earlier was if Riko had access to MTS, that he does not. He does have access to -- to HOGAN.

Page 137

BY MR. CROCKETT:
**Q. Okay.**
A. Okay.
**Q. All right.**
A. So but not -- not to -- not to MTS.
And in this -- and in this case, an incoming SWIFT message could result in a credit to a -- a Wells Fargo account, the same way that an incoming Fedwire message could result to a -- in a credit to a -- to a Wells Fargo account.
So, yes, if a transaction were repaired, the operator who repaired it could -- could -- could access HOGAN to determine if the account number and name provided were the same as the account number and name on the system.
**Q. Okay. Now, the last paragraph of text states, "To process incoming exception wires, the wire transfer services follows standards and procedures that are based on the Uniform Commercial Code, money laundering relations, systems capabilities, operating efficiencies and risk management."**
**What -- what does risk management mean in**

**that -- in that sentence?**
A. Well, risk management is -- is a -- a general term that could be used to -- to sort of broadly refine -- refer to any type of risk involved; whether it's operational risk, credit risk, systemic risk. All those things are -- are considered, you know, when we decide how wire transfers should be processed.
**Q. Okay. The bold sentence at the bottom of the pages says, "Important: If an operator reviews the transaction, the bank is responsible for ensuring that the beneficiary name and account number agree."**
**Is -- is that an accurate statement of Wells Fargo's procedure?**
A. It is. Now, this -- this section happens to apply not to the transaction that we're talking about because this is a SWIFT. They're talking about a wire that was initiated by SWIFT.
The wire that we were talking about is initiated by Fedwire. But the same principal applies, the -- the operator knows that the name and the number are -- disagree, then they're required to, you know, recognize that.
In the case of SWIFT, they don't return



it, but they cancel the transaction. That's one of the differences.
**Q. Okay. And if -- if you look at the next page, there's -- that's -- that's what is -- is stated, that if there is account number correct and name incorrect, the -- the request would be -- would be canceled?**
A. Right.
**Q. Okay. And that --**
A. Because -- because a SWIFT is usually going to be instructions to debit a customer's account and credit another customer's account, as opposed to a Fedwire where there is no Wells Fargo account being debited.
So Fedwires get returned, SWIFT -- SWIFT payment orders get canceled.
**Q. Okay. All right. Let me ask you to go to page 19 of the procedures manual, which is page 561.**
A. Okay.
**Q. As I -- as I read this, this says, "If there's a -- if -- if the account number is valid and the BNF name matches HOGAN, then the transaction goes through, but if -- if that's not the case, then the transaction is canceled."**



**Again, this is referring to SWIFT wire?**
A. Yes.
**Q. Am I reading that correctly?**
A. You are.
**Q. Okay. All right. Are you familiar enough with this manual to tell me where similar procedures are referencing the -- applicable to Fedwires?**
A. Yes. Just --
MS. RUBIN: But obviously not in this situation, just didn't go there, it didn't get kicked out to our exceptions.
But subject to that, he can show you.
THE WITNESS: So if you --
MS. RUBIN: Save you time and effort.
THE WITNESS: So that -- that section begins introducing domestic repairs. So Fedwire's generally considered to be a domestic transaction; although, it's not exclusively a domestic transaction --
BY MR. CROCKETT:
**Q. But this one was, yeah.**
A. This one happened to be. Most of them are, but not all of them.
Same as SWIFT is generally an



international transaction, but not all of them are, there could be domestic SWIFTs, same as there could be international Fedwire.
So we turn around to page 66 -- I'll find the section for you there -- "Repairing Items in the Repair Queue."
Okay. So top of page says 69, the upper left, "If the account number is..." and then you see the third one down it says, "Valid and the BNF name referenced in the Fedwire message text does not match HOGAN."
**Q. Okay.**
A. Then you go over to the right side and you see it -- it indicates that the transaction should be returned.
**Q. Returned to sender, so --**
A. Right.
**Q. -- and that's on page 611 of the --**
A. Yes. Yes. According to the --
**Q. Page 70 of the -- of the procedures manual.**
A. Yeah, the page 69 --
**Q. Okay.**
A. -- of the procedure manual.
**Q. All right. So it's the same fundamental**

Page 142

**policy, but it's just whether it's -- whether it's a Fedwire or a SWIFT wire?**
A. Right. There's different -- different sections in the procedures depending on the source of the transaction. But the principle is the same, if -- if you know that the name and number disagree, don't process the transaction, you know, don't choose one or the other.
**Q. Okay.**
**So you might want to clip that.**
A. I got one.
COURT REPORTER: Twelve.
BY MR. CROCKETT:
(PLF. EXH. 12, DOCUMENT BATES STAMPED WELLS FARGO SHAPIRO 242 - 250, was marked for identification.)
**Q. Okay. I'm going to show you what we'll mark as Exhibit 12.**
MS. RUBIN: You have two. I think he has two.
MR. CROCKETT: I had one too many copies made.
MS. RUBIN: That's all right.
THE WITNESS: What is this?
MS. RUBIN: I don't know.

Page 143

BY MR. CROCKETT:
**Q. This is -- this is a --**
MS. RUBIN: Something we produced.
BY MR. CROCKETT:
**Q. -- this is a policy produced by Wells Fargo as in effect on November 2017, relating to wire transfers. So I'm -- I'm asking if you can -- if you can identify it.**
A. I cannot. I don't recognize it.
**Q. Okay. May- -- maybe if you go to the second page, which is Bates stamped 243, sir, there's approval levels --**
A. I don't --
**Q. -- does this -- does this ring a bell?**
A. Well, it -- it -- it rings a bell, but it's not a -- it's not a procedure that applies to my department.
By reading this, I would draw the conclusion that it -- it applies to an area of the bank, possibly the branches where they create wire transfers. My -- my team doesn't create wire transfers, we process wire transfers that are created by a customers or other internal departments.
**Q. Okay. Well, if there -- there is a small**

Page 144

**part of this document that is another part of this document. If we go to page 247, looking at the bottom, there's -- see where it says "incoming wires" and reference to OFAC screening?**
MS. RUBIN: Object to the form?
BY MR. CROCKETT:
**Q. Do you -- are you familiar with those --**
A. I'm not familiar with this document at all.
**Q. Okay.**
A. I mean, I --
**Q. Fine.**
A. -- I could read and understand what's here, but I'm not familiar --
**Q. So could I.**
A. -- with this document itself.
**Q. Okay. And can you -- can you tell me if this is a policy that Wells Fargo has in effect on November 21, 2017?**
A. I cannot.
(PLF. EXH. 13, DOCUMENT BATES STAMPED WELLS FARGO SHAPIRO 422 - 425, was marked for identification.)
**Q. Okay. All right. I'm going to show you what we'll mark as Exhibit 13.**

Page 145

**Can you identify Exhibit 13?**
A. No.
**Q. Entitled, "Wire Transfers: Incoming Wire Instructions."**
A. Never seen this document before.
**Q. Okay.**
A. So, I mean --
MS. RUBIN: If you want to take a break, I can maybe figure out what this is, 'cause I wasn't familiar with this either.
MR. CROCKETT: We can -- I --
MS. RUBIN: You know what it is?
MR. CROCKETT: I -- no, I don't know what it is, but you -- we can deal with it; I mean, I -- I think if you can tell me what it is by a letter --
MS. RUBIN: Okay.
MR. CROCKETT: -- I'm sure I -- that would be acceptable. We don't have to do it this afternoon; I mean, we --
THE WITNESS: It looks like it might be something that instructs --
MS. RUBIN: Branches?
THE WITNESS: -- customers on how to -- how to have wires sent to them, but I don't

Page 146

recognize it.
BY MR. CROCKETT:
**Q. It's -- it's -- it's not to customers, you know, but -- but it may be -- I mean, from looking at it from reading a lot of these --**
A. Well, it could be, yeah. It says --
**Q. I think it's probably --**
A. -- "provided to customers," so you're right, it's not for customers, just about customers. This looks like branch procedures to me.
MS. RUBIN: That's what I'm thinking it is.
BY MR. CROCKETT:
**Q. I -- I mean --**
A. Yeah.
**Q. -- just from looking at it, that would be my guess --**
A. Yeah.
**Q. -- but, again, you're here to tell me, not --**
A. Yeah. So -- so --
**Q. -- not the --**
A. -- all I can say is that I don't --
**Q. -- not the other way around.**

Page 147

A. -- I don't recognize it though --
**Q. Okay. That's fine.**
A. -- with the... And if they are branch procedures, I would say it's not relevant to the transaction that we're discussing.
(PLF. EXH. 14, DOCUMENT BATES STAMPED WELLS FARGO SHAPIRO 379 - 389, was marked for identification.)
**Q. Okay. So I'm going to show you what's marked as Exhibit 14. A similarly formatted document relating to fraud and forgery claims.**
A. It is definitely branch procedures, which is why I don't recognize them.
(PLF. EXH. 15, DOCUMENT BATES STAMPED WELLS FARGO SHAPIRO 11 - 13, was marked for identification.)
**Q. Okay. All right. So I won't ask you any further questions about those.**
**So I will show you Exhibit 15.**
**Can you identify this document entitled "Wells Fargo Wire Transfers Terms and Conditions"?**
A. I don't have personal knowledge of this document. Appears to be used for initiating wires through our on-line banking platform.
Looks like I got two of these.

Page 148

**Q. So your understanding is Exhibit 15 is the terms between Wells Fargo and its account holders with regard to outgoing wires?**
A. With regard to outgoing wires --
MS. RUBIN: On-line.
THE WITNESS: -- initiated through the on-line banking platform.
BY MR. CROCKETT:
**Q. Okay. So --**
A. I'm not the expert on that.
**Q. But your understanding is it wouldn't be pertinent --**
A. Right.
**Q. -- to this case?**
A. Exactly right.
(PLF. EXH. 16, DOCUMENT BATES STAMPED WELLS FARGO SHAPIRO 3 - 4, was marked for identification.)
**Q. Okay. I'm going to show you Exhibit 16.**
**Are you familiar with this document, sir?**
A. Indirectly I am. It looks like it's the recall message that was sent from Citibank to Wells Fargo in order to recall the November 21st wire that was sent to -- that we've been talking about here.

Page 149

**Q. Can you tell when the -- the Citibank written request was sent?**
A. I -- I -- I can't --
**Q. Is that one of the many numbers on this document?**
A. I believe it -- I believe it's December the 14th, because their field 20, which is the Citibank reference number, is CIT171214, so that -- that's -- I believe that's -- that's going to be their investigation's case number and --
MS. RUBIN: But it says WFW171215.
THE WITNESS: Yeah. So that's the Wells Fargo case number, but I can't tell from this exactly when it was sent --
BY MR. CROCKETT:
**Q. It would appear to be either December 14th or 15th?**
A. That's -- that be my --
**Q. Those are the only two dates that we seem to have come up with --**
A. Right.
**Q. -- anyway. Okay.**
A. Yeah, so -- yeah, they could have sent it on the 14th, and the Wells Fargo case was opened on the 15th.

Page 150

That WFW is -- number is a Wells Fargo case number. And then next to it the transaction number, the TRN is the transaction number that corresponds to the $504,611.13 wire.
**Q. Do you know, is there a word for the written communication that is sent by Citibank in a situation such as this?**
A. Well, it's sent via SWIFT. SWIFT, as we were talking about before, but it's a SWIFT free-format message that's -- in the industry, generally this one is -- is referred to as a recall request.
**Q. Okay.**
A. So free-format messages can be anything basically that... But in -- in this particular one they're requesting that a wire that they sent be sent back to them.
**Q. And I believe you said at this point your investigations unit determined that the money had already been removed from --**
A. Right.
**Q. -- the account, so that was the end of the story essentially?**
A. Right. They had to decline the recall request.

Page 151

**Q. Okay. All right. Do you know who -- who was involved in that process, in the investigations unit?**
A. I do not.
**Q. Okay. All right. I'm going to show you what has been --**
**Anyone need a break? No?**
A. Good.
**Q. Everyone's -- everyone's...**
(PLF. EXH. 17, DOCUMENT BATES STAMPED PS 29 - 32, was marked for identification.)
**Q. Okay. I'll show you Exhibit 17.**
**Are you familiar with Exhibit 17?**
A. No, sir.
MS. RUBIN: Does this go with it?
MR. CROCKETT: It's -- it's an -- is yours not stapled? Yeah --
MS. RUBIN: No.
MR. CROCKETT: Let me give you another one.
MS. RUBIN: So this is 17?
MR. CROCKETT: Yeah.
BY MR. CROCKETT:
**Q. Did you come to learn that -- that a formal demand was sent to Wells Fargo prior to the filing of this action?**

Page 152

A. I was not aware of it, no.
MS. RUBIN: Outside scope.
I assume you just meant that for the individual --
MR. CROCKETT: Yeah.
MS. RUBIN: Not for the corporation.
BY MR. CROCKETT:
(PLF. EXH. 18, WELLS FARGO BANK, N.A.'S NOTICE OF SERVICE OF ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, was marked for identification.)
(PLF. EXH. 19, WELLS FARGO BANK, N.A.'S RESPONSE TO PLAINTIFF'S SECOND SET OF INTERROGATORIES, was marked for identification.)
**Q. Okay. I'm going to show you what's -- what we will mark as Exhibit 18 and Exhibit 19, which I think we can handle in one fell swoop.**
**Are these interrogatories that you swore to the answers of on behalf of Wells Fargo?**
**Take a moment, go through them while I'm giving a copy to your counsel.**
A. I think I may have one or two extra copies here, so just --
MS. RUBIN: I think --

Page 153

THE WITNESS: -- just re-correlate them for me.
MS. RUBIN: (Inaudible)
MR. CROCKETT: Yeah, I gave you two copies of both. I apologize.
MS. RUBIN: Wait a minute. Are these all the same?
MR. CROCKETT: No, this -- one's first, one's second.
MS. RUBIN: Yeah, I know. I'm just trying to figure it out.
MR. CROCKETT: Okay.
MS. RUBIN: Oh, wait, this isn't stapled. Give me that one.
MR. CROCKETT: You want first or second?
MS. RUBIN: First, please.
And this is going to be consolidated --
MR. CROCKETT: First is 18.
MS. RUBIN: Oh, I thought you consolidated.
MR. CROCKETT: Second is 19.
MS. RUBIN: Okay. First 18...
BY MR. CROCKETT:
**Q. We're just going through documents at this point, sir.**

A. Yeah. Yes. So these are -- these are the same ones that -- appear to be, anyway -- the same ones that I read and signed for a month or two ago.
MS. RUBIN: Or actually July of 2018.
THE WITNESS: July? Yeah, so...
MS. RUBIN: Oh, right.
THE WITNESS: Yeah, well --
MS. RUBIN: That's --
THE WITNESS: -- one's --
MS. RUBIN: You're right.
THE WITNESS: -- two months ago --
MS. RUBIN: Yeah.
THE WITNESS: -- and two weeks ago.
BY MR. CROCKETT:
**Q. Okay. So I will -- I think I have one more question, but it's at compound question, so if counsel objects it will be 15 minutes, but if she doesn't object it will -- it will be shorter.**
**So let me see. And I'll have copies... Taking out the duplicates.**
MS. RUBIN: Do you want to stay on? Jeff, do you want to stay on?
MR. CROCKETT: It's okay, I'm done. Yeah, I should have gone on break, but I'm done.



BY MR. CROCKETT:
(PLF. EXH. 20, DOCUMENT BATES STAMPED PS 27, was marked for identification.)
(PLF. EXH. 21, DOCUMENT BATES STAMPED WELLS FARGO SHAPIRO 466 - 473, was marked for identification.)
(PLF. EXH. 22, DOCUMENT BATES STAMPED WELLS FARGO SHAPIRO 474 - 477, was marked for identification.)
(PLF. EXH. 23, DOCUMENT BATES STAMPED WELLS FARGO SHAPIRO 478 - 481, was marked for identification.)
(PLF. EXH. 24, DOCUMENT BATES STAMPED WELLS FARGO SHAPIRO 482 - 485, was marked for identification.)
(PLF. EXH. 25, DOCUMENT BATES STAMPED WELLS FARGO SHAPIRO 486 - 489, was marked for identification.)
(PLF. EXH. 26, DOCUMENT BATES STAMPED WELLS FARGO SHAPIRO 490 - 493, was marked for identification.)
(PLF. EXH. 27, DOCUMENT BATES STAMPED WELLS FARGO SHAPIRO 494 - 497, was marked for identification.)
**Q. Okay. So I'm showing you what I believe**



**to be from the documents produced by Wells Fargo Exhibit 20, which is a list of the outgoing wires from the Achebe account; and Exhibit 21, the checking account, and Exhibit 22 through 27, paperwork for the underlying wires.**
**So I understand, the question is: Can you identify these as Wells Fargo records?**
**I'm not asking you to or I'll take a stipulation from counsel --**
MS. RUBIN: We'll have to get with Dori on these, but I assume he's not going to know anything about any of these.
THE WITNESS: Yeah, I'm --
BY MR. CROCKETT:
**Q. No, and I'm not expecting you to. Just if you can identify them as the -- from being Wells Fargo documents that --**
A. Well, this -- I mean --
MS. RUBIN: I don't know if this one is.
THE WITNESS: I don't -- I don't know about this one either, but --
MS. RUBIN: Twenty-seven --
THE WITNESS: -- 20- --
MR. CROCKETT: No --
MS. RUBIN: -- right, it's your document?



THE WITNESS: Twenty-one is -- looks like a Wells Fargo checking account statement to me.
MS. RUBIN: Which one?
THE WITNESS: Twenty-one.
BY MR. CROCKETT:
**Q. Okay. You're right, 20 may be from Citibank, but --**
MS. RUBIN: I don't think it's --
BY MR. CROCKETT:
**Q. -- with information from Wells Fargo. Okay.**
MS. RUBIN: No, I don't think it is.
THE WITNESS: Twenty-one looks like the -- the document that someone who presents himself in person at the branch to initiate a wire would complete -- would have completed for them at the branch.
MS. RUBIN: What number's that?
THE WITNESS: Twenty-two.
MS. RUBIN: Twenty-two.
THE WITNESS: So again, I'm not the expert on these, so -- but they all look like they were wired -- wires that were initiated in branch -- in person in a branch, 22 through 26.
MR. CROCKETT: Okay. I have no further

Page 158

questions for you.
MS. RUBIN: Okay. I may have. Can we take a break, I may have --
MR. CROCKETT: Of course.
MS. RUBIN: -- a couple questions.
MR. CROCKETT: Sure.
MS. RUBIN: I'm going to have trouble giving you everything because he didn't really number the end.
VIDEOGRAPHER: Do you want to go off the record?
MS. RUBIN: Yeah, can we go off.
MR. CROCKETT: Sure.
VIDEOGRAPHER: We're going off the record at 3:22 p.m.
(A recess transpired.)
VIDEOGRAPHER: We're going back on the record at 3:28 p.m.

EXAMINATION

BY MS. RUBIN:

**Q. You were asked a series of questions earlier by Mr. Crockett about the mismatch that shows in the Wells Fargo system when it went through the -- the MTS system?**
A. MTS, yes.

Page 159

**Q. And when it says "mismatch," what does that mean within the system?**
A. Well, it means it's not an exact match. So the name provided is not an exact match to the name that is the title of the account. So an example could -- could be the one we have where Chris Achebe and James Messenger, but it could also be as simple as an incoming lawyer for Jim Ansbro but the account is in the name of James Ansbro. That's a mismatch as well. Or James P. Ansbro may be the -- may be the -- the -- the -- the title of the account, but not the way the -- the wire comes in. So in some cases, the mismatches are -- are different degrees than -- than in others.
You know, lots of companies refer to themselves by acronyms and -- instead of the full name, so in those cases the company name might -- on HOGAN might have the acronym, but the name on the -- on the -- on the wire might be the full name spelled out or vice versa. Those -- those are also mismatches.
**Q. Would it be a mismatch too if the -- the money was coming to a company and the account was an individual name?**
A. Yes. Yes.

Page 160

**Q. And how about if for me it's a -- I have a joint account, would that be a mismatch if the company --**
A. Yes.
**Q. -- if the money came just to me?**
A. Yes. That's another good example. So that if John and Jane Doe were a married couple and the name was in the -- they had a joint account and the -- the wire came in for Jane Doe and the account was in the name of John and Jane Doe, then that would be a mismatch as well.
**Q. So the only way you would not get mismatches if the person sending the money knows exactly the way that the account is titled?**
A. It has to be -- it has to be a -- a match to the way the account is titled on the DDA system.
**Q. And when you mean -- say "match," you mean an exact match?**
A. Yes.
MS. RUBIN: Okay. I don't have anything else.
MR. CROCKETT: No further questions.
VIDEOGRAPHER: We're going off the record at 3:30 p.m.
(The Witness, after having been advised of his right to read and sign this transcript, does not waive that right.)

Page 161

(The deposition concluded at 3:30 p.m.)

CERTIFICATE OF REPORTER

I, Sherri L. Puleo, Shorthand Reporter and Notary Public for the State of North Carolina at Large, do hereby certify that the foregoing transcript is a true, accurate, and complete record.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.

Witness my hand, I have hereunto affixed my official seal this 19th day of September, 2018, at Mecklenburg County, North Carolina.

__________________________________

Sherri L. Puleo, Shorthand Reporter
My Commission expires
February 26, 2022